# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 9, 2010 Session

## STATE OF TENNESSEE v. JOSE AMATES MARTINEZ

**Direct Appeal from the Criminal Court for Smith County**
**No. 08-238     John Wootten, Judge**

---

**No. M2009-02641-CCA-R3-CD - Filed October 27, 2011**

---

The grand jury of Smith County indicted Defendant, Jose Amates Martinez, for the Class A felony offense of conspiracy to possess with intent to sell or deliver 150 grams or more of heroin, a Schedule I controlled substance. Following a jury trial, Defendant was convicted as charged, and after a sentencing hearing, he was sentenced to serve twenty years. On appeal, Defendant raises the following issues: (1) the evidence was insufficient to sustain the conviction; (2) the trial court erred by denying his motion to dismiss the indictment and/or suppress all evidence seized because the agents who stopped Defendant and searched the vehicle he was driving were working outside their territorial jurisdiction and beyond their lawful scope of authority; (3) the trial court erred by denying his additional motion to suppress evidence based upon Defendant's assertions that Defendant was unlawfully stopped, Defendant's consent to search was not knowingly and voluntarily given, and the search by the agents exceeded the scope of consent, if the consent was valid; (4) the trial court erred by overruling Defendant's objection to the testimony of the forensic scientist regarding test results of the heroin seized; and (5) the trial court erred by overruling Defendant's objection to a law enforcement officer's testimony of the street value of the heroin seized. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and ALAN E. GLENN, JJ., joined.

J. Branden Bellar, Carthage, Tennessee, for the appellant, Jose Amates Martinez.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; Javin Cripps, Assistant District

Attorney General; and Tom Swink, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Facts

From the testimony and other evidence at trial, the following events pertinent to this case occurred on July 8 and July 9, 2008. On July 8, 2008, Defendant, a resident of Tacoma, Washington, flew from Mexico City, Mexico, to Charlotte, North Carolina. The next day, July 9, Defendant was driving a silver-colored Volvo CX90 SUV westbound on Interstate 40 in Smith County at approximately 1:00 p.m. The owner of the Volvo, Jose Gomez (Gomez), was the only passenger in the vehicle with Defendant. At that time, Agent Rhett Campbell (Campbell) and Agent Chris Utley (Utley) of the 21st Judicial District Drug Task Force (DTF), were inside Campbell's marked DTF SUV which was parked in the median of Interstate 40 in Smith County in an authorized turnaround spot approximately two miles east of the Carthage exit.

Campbell was in the driver's seat and Utley was in the front passenger seat. Their DTF vehicle was parked facing the westbound lane of traffic, and they were performing criminal interdiction work focused upon westbound vehicles. When Defendant's vehicle came within sight of the DTF vehicle, Defendant's Volvo suddenly slowed down dramatically and proceeded on westbound out of the sight of Campbell and Utley. The sudden slowdown by Defendant attracted the attention of the DTF agents so they pulled out onto the westbound lanes in order to follow and further observe the Volvo. Defendant increased the speed of the vehicle he was driving after initially leaving the sight of the agents in the previously parked DTF vehicle. After a few miles, the agents finally regained visual contact with Defendant's vehicle and the radar in Campbell's vehicle showed that Defendant was driving 81 m.p.h. in a 70 m.p.h. speed zone. Campbell "paced" Defendant's vehicle for one to one and one-half miles, and observed that Defendant's speed ranged from 75 to 77 m.p.h., still in a 70 m.p.h. speed zone. Having concluded that Defendant could be lawfully stopped for speeding, Campbell turned on his blue lights. Defendant promptly pulled over and stopped on the shoulder of the road. Campbell parked the DTF patrol vehicle a few feet behind the Volvo.

At that point, Campbell exited this vehicle and approached the Volvo on the passenger side and spoke to Defendant through the passenger side window. Utley remained inside the DTF vehicle and monitored the interaction by sight and by listening to a transmission from Campbell's microphone.

Campbell asked Defendant for his driver's license and for Defendant to step from his vehicle and stand behind it, to which Defendant complied. At this time, Gomez remained seated in the Volvo. Campbell noted that Defendant exited the vehicle holding an unopened soft drink can, and Campbell testified, "I've never seen anyone ever do that before." Campbell asked Defendant how fast he had been driving, and Defendant responded "eight-five miles an hour" but then corrected himself and said seventy-five miles per hour. Campbell explained to Defendant that the radar showed he was driving eight-one miles per hour at one point, and that the DTF agents had paced Defendant at a range of seventy-five to seventy-seven miles per hour. In response to Campbell's questioning, Defendant stated they were traveling to Tacoma, Washington, that the Volvo belonged to the passenger in that vehicle, and the passenger's first name was Jose, but Defendant did not know his last name.

Campbell then walked back to the Volvo to speak with Gomez and obtained his full name and the registration and insurance information for the vehicle. Mr. Gomez's driver's license showed his home was in Temecula, California, which is in southern California. At this time Campbell noticed an excessive amount of dust on the dashboard and instrument panel area of the Volvo, as well as a "chemical smell" inside the vehicle. In his testimony, Utley described a strong odor of Bondo auto body filler (hereinafter Bondo) in the vehicle. Campbell got back into his vehicle and called the DTF dispatcher, Blue Lightning Operation Center (BLOC) in Gulfport, Mississippi, and gave the dispatcher the names and identification information of Defendant and Gomez, as well as information on the vehicle.

Campbell again approached Defendant, who was still standing outside the vehicles and asked Defendant where they were traveling from. Defendant responded, "North Carolina." Campbell asked Defendant which city in North Carolina and Defendant's response was that he did not remember. Then Defendant pulled out of his shirt pocket an airline receipt showing that Defendant had flown from Mexico City to Charlotte, North Carolina the previous day. After Campbell had looked at the airline receipt, he quizzed Defendant more, to clarify Defendant's traveling. Defendant confirmed he had flown from Mexico City to Charlotte, North Carolina, the previous day, and added that Mr. Gomez had paid Defendant to help Mr. Gomez drive the car across the country to Tacoma, Washington. Defendant told Campbell, in response to further questions, that there were no guns, no illegal drugs, and no large amounts of money inside the Volvo. At Campbell's request, Defendant gave his verbal consent to Campbell to search the vehicle. Campbell also separately asked Mr. Gomez to identify where the pair were traveling from. Mr. Gomez picked up an atlas, initially pointed to Charlotte, North Carolina, but then moved his finger on the atlas to Greenville and confirmed Campbell's specific inquiry that Defendant and Mr. Gomez were traveling from Greenville, South Carolina. Mr. Gomez also gave verbal consent for Campbell to search the vehicle.

At Campbell's request, Mr. Gomez stepped out of the Volvo and joined Defendant standing by the shoulder of the interstate. Campbell asked both if they could read Spanish, to which they both responded affirmatively. Campbell returned to his vehicle to fill out a Spanish language consent to search form. When that was done, he handed the form to each of the men, who were standing next to each other. They both read the consent to search form, and each signed his name to it. Defendant and Mr. Gomez were given the option at that time to either stand on the shoulder of the road or to sit in the back of the DTF vehicle during the search of the Volvo. They chose to continue standing on the shoulder of the interstate highway.

In his testimony, Campbell detailed the facts surrounding the stop of Defendant's vehicle which caused Campbell to request consent to search the Volvo: (a) Defendant's hands were shaking when he handed over his driver's license; (b) Defendant exited his vehicle with an unopened soft drink; (c) Defendant did not know what city in North Carolina he was traveling from; (d) Defendant stated that he did not know his passenger's last name, though he had flown from Mexico City to Charlotte, North Carolina only the previous day and then began to drive the passenger's vehicle across the country to Tacoma, Washington; (e) Defendant was "stepping away" from Campbell when asked if there were illegal items in the Volvo; and (f) excessive dust was covering the dashboard of the Volvo.

Campbell and Utley began the search of the Volvo with Campbell looking inside the vehicle at the front driver's side and Utley at the front passenger's side. From training and/or law enforcement experience, both agents were familiar with the structure of a Volvo SUV, and where hidden compartments could be located. Campbell immediately noticed that the plastic molding, which covers the bolts used to hold down the driver's seat, was not "snug" on top of the carpet as it should have been but was instead about one-half inch above the carpet. This caused him to remove the molding, and he then observed that the bolts had excessive scratching. Campbell returned to the DTF vehicle and retrieved his tool kit. The agents then removed the bolts and took the driver's seat out of the vehicle. Utley was able to remove one of the bolts with only his hand. Under the carpet which was then exposed, they saw that Bondo had been spread on the floor of the Volvo, and there was a lot of dust on the floor. The agents then frisked Defendant and Mr. Gomez to confirm they had no weapons and placed them into the back of the DTF vehicle, from which they could not exit without someone else opening the outside door handle. The agents took this precaution so that their attention would not be disrupted while they searched inside the just-discovered hidden compartment in the Volvo. Utley then went to the driver's side of the Volvo and Campbell went to the passenger's side. Utley took his flashlight and banged it on the floor, which cracked the Bondo and showed the outline of a "door" on the floor. Utley observed what looked like fresh silver spray paint on the floor. Utley pulled the "door" out, and the agents initially found five vacuum sealed bags of what they believed to be black tar heroin.

-4-

A sixth vacuum sealed bag was discovered the next day when the Volvo was being further examined at the DTF office. That last bag had been tucked deep into the side of the hidden compartment. A similar hidden compartment under the passenger's seat of the Volvo was empty. The agents then went back to the DTF vehicle, handcuffed Defendant and Mr. Gomez, and placed each of them under arrest. Cassandra Franklin-Beavers, a Tennessee Bureau of Investigation (TBI) Crime Laboratory forensic scientist, testified that the total weight of the six packages found in the Volvo was approximately 24.5 pounds, and a sample tested positive for heroin. Ubaldo Rios, a Special Agent with Immigration Customs Enforcement, testified about his extensive experience and training as a law enforcement officer concerning the selling and transportation of illegal drugs, including heroin. He testified that a kilogram (equal to one-thousand grams) is equal to 2.2 pounds. Based upon this, the approximately 24.5 pounds of heroin found in the Volvo constituted a little over 11 kilograms, or 11,000 grams. The retail street value of all the heroin found in the Volvo, if it was sold by the gram, would be approximately $1,200,000.00.

This summarized the evidence presented during the trial. Defendant did not testify or offer any other evidence. Additional facts developed during pre-trial motion hearings (or at trial if applicable) which relate to the issues raised by Defendant will be summarized as necessary in addressing those issues.

## ANALYSIS

### *Sufficiency of the Evidence*

Defendant's arguments challenging the sufficiency of the evidence to sustain his conviction assert that the State failed to prove beyond a reasonable doubt: (1) that any conspiracy occurred in Tennessee; (2) that there was a conspiratorial agreement or "mutual implied understanding" between Defendant and Mr. Gomez; and (3) that either Defendant or Mr. Gomez had the culpable mental state to commit the offense of possession of 150 grams or more of heroin with intent to sell or deliver. The case *sub judice* is based substantially on circumstantial evidence.

Recently, our supreme court succinctly stated the appropriate standard of review whenever there is a challenge to sufficiency of the evidence on appeal, including situations where the proof is based upon circumstantial evidence. In *State v. Dorantes*, 331 S.W.3d 370 (Tenn. 2011), the court set forth,

> "When considering a sufficiency of the evidence question on appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221

S.W.3d 514, 521 (Tenn. 2007). "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973); *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 456–58 (1958). Ultimately, however, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and[, moreover,] the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable*, 313 S.W.2d at 457 (citations omitted)). On appeal, the court may not substitute its inferences for those drawn by the trier of fact in circumstantial evidence cases. *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010); *Liakas v. State*, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). The standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *Hanson*, 279 S.W.3d at 275 (quoting *State v. Sutton*, 166 S.W.3d 686, 689 (Tenn. 2005)).

*Id*. at 379.

Also in *Dorantes*, the Court overruled the case of *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610 (1971) to the extent that *Crawford* required the State, in a circumstantial evidence case, "to prove facts and circumstances 'so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt.' [*Crawford*, 470 S.W.2d] at 612." *Dorantes*, 331 S.W.3d at 380. The Court in *Dorantes* adopted the standard enumerated by the United States Supreme Court in *Holland v. United States*, 348 U.S. 131, 75 S. Ct. 127 (1954), which was cited with approval in *Jackson*, where the Supreme Court "specifically rejected the notion 'that the prosecution [i]s

under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt.' *Jackson*, 443 U.S. at 326, 99 S. Ct. 2781." *Dorantes*, 331 S.W.3d at 380. Accordingly, direct evidence and circumstantial evidence must be treated the same when an appellate court weighs the sufficiency of the evidence to support a conviction. *See Dorantes*, 331 S.W.3d at 381.

Our General Assembly has defined the crime of conspiracy as follows:

The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

Tenn. Code Ann. § 39-12-103(a).

In addition, an overt act by the defendant, or a person with whom he conspired, done in pursuance of the conspiracy must also be proven beyond a reasonable doubt. Tenn. Code Ann. § 39-12-103(d).

Affording the State the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom, as we are required to do, *Vasques*, 221 S.W.3d at 521, the evidence at trial proved beyond a reasonable doubt that on July 8, 2008, Defendant, who resided in Tacoma, Washington, flew from Mexico City, Mexico, to Charlotte, North Carolina. By this time, he had agreed to help Jose Gomez drive Mr. Gomez's vehicle across the country from either Charlotte, North Carolina or Greenville, South Carolina to Tacoma, Washington, for payment from Mr. Gomez, even though Defendant did not know Mr. Gomez's last name, and Tacoma was Defendant's, and not Mr. Gomez's, residence. Defendant appeared nervous at times during the stop and search prior to contraband being found, and in fact stepped back away from the DTF agent when asked if there were illegal drugs in the vehicle. There was an excessive amount of Bondo dust in the passenger compartment of the vehicle, and the area where the hidden compartments were located was covered by fresh paint and fresh Bondo, indicating the compartments had recently been made for hiding contraband. Over 24 pounds (approximately 11,000 grams) of black tar heroin, with a retail street sale value of approximately 1.2 million dollars, was found in the hidden compartments of the vehicle Defendant was driving. Agent Utley noticed that Defendant and Mr. Gomez were talking with each other, apparently carrying on a normal conversation with each other, while standing outside their vehicle during the initial portion of the search. However, once it became obvious that the DTF agents had discovered the hidden

compartments and were working toward opening them up, Defendant and Mr. Gomez stopped talking completely and just began staring straight at the ground.

The jury could reasonably infer the following facts. At some time prior to July 8, 2008, Defendant traveled from his home in Tacoma, Washington, to Mexico City, Mexico, though his mode of transportation on this journey is unknown. However, he flew from Mexico City to Charlotte, North Carolina, and no later than the next day, he entered into an agreement with Mr. Gomez to be paid by Mr. Gomez to help drive Mr. Gomez's vehicle, with its hidden black tar heroin, to Defendant's hometown of Tacoma, Washington. This destination was agreed to by Defendant and Mr. Gomez even though Mr. Gomez lived in Temecula, California. Since Defendant did not know Mr. Gomez's last name, and the destination of Mr. Gomez and his vehicle was not Mr. Gomez's place of residence, it is reasonable to infer the trip was for a nefarious, unlawful reason, rather than a friend helping a friend. A defendant can constructively possess contraband found in a vehicle the defendant is driving, even if the vehicle belongs to another person. *State v. Gonzalo Moran Garcia*, No. M2000-01760-CCA-R3-CD, 2002 WL 242358, at *35 (Tenn. Crim. App. at Nashville, Feb. 20, 2002), *rev'd on other grounds*, *State v. Garcia*, 123 S.W.3d 335, 342 (Tenn. 2003) ("defendant's ownership *or control over* a vehicle in which the contraband is secreted will support a finding of constructive possession"); *State v. Brown*, 915 S.W.2d 3, 7 (Tenn. Crim. App. 1995) ("Knowledge may be inferred from control over the vehicle in which the contraband is secreted."). The amount of heroin found, approximately 11,000 grams, and its retail street value, approximately 1.2 million dollars, implies that it was possessed with intent to sell or deliver. Tenn. Code Ann. § 39-17-419 ("It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance . . . w[as] possessed with the purpose of selling or otherwise dispensing."). Clearly, the amount of heroin exceeded 150 grams. The action of Defendant and Mr. Gomez in ceasing their conversing with each other and then just looking silently at the ground when it was obvious DTF agents had discovered the hidden compartments implies their guilty knowledge of the presence of the heroin. Defendant's reaction of backing away from Agent Campbell when asked if there were illegal drugs in the vehicle also implies guilty knowledge by Defendant. Obviously, the overt act in furtherance of the conspiracy was the transportation of the heroin inside the Volvo SUV.

Defendant specifically argues that the State failed to prove that a conspiracy occurred in Tennessee. Defendant asserts that if there was a conspiracy, it occurred in North Carolina. This contention is without merit. Conspiracy is a continuing offense. As pertinent herein, Tennessee Code Annotated section 39-12-103(e)(1) provides in part that "[conspiracy is a continuing course of conduct that terminates when the objectives of the conspiracy are completed . . . ." Even if the conspiracy began in North Carolina (or South Carolina,

California, Washington, or Mexico City) the overt act of transporting the heroin in furtherance of the conspiracy occurred partly in Tennessee.

Defendant also specifically challenges the sufficiency of the evidence that a conspiratorial agreement existed between Defendant and Mr. Gomez. "A conspiracy is 'an agreement to accomplish a criminal or unlawful act.' *State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998). The agreement 'need not be formal or expressed, and it may be proven by circumstantial evidence.' *Id*." *Vasques*, 221 S.W.3d at 522. The State may show the existence of a "mutual implied understanding" between the parties to the conspiracy in order to prove the existence of a conspiratorial relationship. *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). "'Conspiracy implies concert of design and not participation in every detail of execution.'" *Id*. (quoting *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978). Defendant told Agent Campbell that Defendant had an agreement with Mr. Gomez that he (Defendant) would be paid by Mr. Gomez to assist in driving Mr. Gomez's vehicle across the United States. Again, a reasonable inference could be made by the jury, based upon other circumstantial evidence, that Defendant knew the cargo of the vehicle was over 24 pounds of black tar heroin, and a critical part of his agreement with Mr. Gomez was to transport the heroin - and not just Mr. Gomez and his vehicle.

Finally, Defendant specifically argues that the State failed in its proof to show that either Defendant or Mr. Gomez had the culpable mental state to commit the offense which was the object of the conspiracy, i.e., possession of 150 grams or more of heroin with the intent to sell or deliver the heroin. As pertinent here, it is a criminal offense for a person to "knowingly" possess 150 grams or more of heroin. Tenn. Code Ann. § 39-17-417(a). As applicable herein, "(b) 'knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b). The State was required to prove that both Defendant and Mr. Gomez each had the culpable mental state of "knowing" for the offense of possession of 150 grams or more of heroin with intent to sell or deliver. Circumstantial evidence as to Mr. Gomez's culpable mental state includes the extensive alteration of his vehicle to make the compartments used to hide the heroin, his agreement to pay Defendant to help him drive the vehicle from the east coast to Defendant's hometown of Tacoma (as opposed to Mr. Gomez's hometown of Temecula, California), and Mr. Gomez's change in demeanor from being talkative with Defendant to being quiet and staring at the ground when the agents found the hidden compartment. Similarly, circumstantial evidence of Defendant's culpable mental state of "knowing" was shown by the same change in demeanor as Mr. Gomez when the agents found the hidden compartments, Defendant's shaking during the stop, his backing away from Agent Campbell when asked about the presence of illegal drugs in the vehicle, and Defendant's unusual travel from Tacoma to Mexico City (by unknown means) and from there to Charlotte, North

Carolina via commercial airline, in order to begin driving, for hire, across country the very next day, a vehicle owned by a man whose last name was unknown to Defendant.

Defendant also implies in his brief that the State was limited to proof of conspiratorial activity which occurred only on July 9, 2008. The indictment does allege that Defendant, on July 9, 2008, committed the conspiracy in Smith County. However, it is well settled that

> [t]he rule is that the offense must be proved to have been committed prior to the finding of the indictment and within the time specified by any applicable statute of limitations; and, except where a special date is essential or time is of the essence of the offense, the time of the commission of the offense averred in the indictment is not material and proof is not confined to the time charged.

*State v. West*, 737 S.W.2d 790, 792 (Tenn. Crim. App. 1987).

While most of the evidence in this case is circumstantial evidence, under the standards set forth and discussed in *Dorantes*, the evidence is sufficient to sustain Defendant's conviction beyond a reasonable doubt. Defendant is not entitled to relief on this issue.

### *Authority of the DTF Agents to Operate in Smith County*

Prior to trial, Defendant filed a "Motion to Dismiss Indictment" which alleged:

> That the State of Tennessee through the 21st Judicial District Drug Task Force exceeded both the territorial jurisdiction and scope of its authority by conducting drug interdiction on I-40 within the geographic boundaries of Smith County, Tennessee and Gordonsville, Tennessee without a lawful interlocal agreement or otherwise lawful contract or mutual aid agreement to do so.

In his motion to dismiss the indictment, Defendant requested alternative relief that evidence "illegally obtained" be suppressed.

The 21st Judicial District of Tennessee is comprised of Williamson, Hickman, Lewis, and Perry Counties. Smith County, where Defendant was stopped and the heroin was seized following the search of the vehicle Defendant was driving, is in the 15th Judicial District of Tennessee. Defendant's specific argument, as set forth in his brief, is that

> the 21st Judicial District Drug Task Force operated in Smith County, Tennessee, extra jurisdictionally and unlawfully and outside the parameter of the interlocal agreement. As such, any stops with subsequent searches under

the color of authority of the 21st and 15th Judicial District Drug Task Forces should be deemed unlawful and the indictment dismissed.

The record contains a copy of a portion of the minutes of a meeting of the Smith County Commission, but the precise date of the meeting is unclear. However, Defendant's counsel, who submitted the minutes as an exhibit to the hearing, acknowledged that the minutes were from a meeting of the Smith County Commission which occurred prior to the stop of Defendant which led to his arrest and prosecution. The record indicates that the County Commission meeting was sometime in the 1980's during the administration of Governor Ned McWherter. The Smith County Commission unanimously approved a motion for Smith County to join with the other counties and the municipalities of the 15th Judicial District to form and participate in the 15th Judicial District Drug Task Force.

Also admitted as an exhibit at the hearing was the "Inter-Agency Mutual Aid Agreement Between: The 21st Judicial Drug Task Force and The 15th Judicial Drug Task Force." This agreement was executed in November 2006, and among other provisions, specified that,

> The 21st [Judicial Drug Task Force] and 15th [Judicial Drug Task Force] will endeavor to disrupt the illicit manufacturing, sales, distribution and trafficking of illegal drugs by immobilizing targeted violators and drug trafficking organizations throughout the 15th Judicial District.

Michael Nesbitt, the County Mayor of Smith County since 2002, testified that a signed agreement titled "Interlocal Cooperation and Mutual Aid Agreement for the 15th Judicial District Drug Task Force" (also made an exhibit), signed by the sheriffs of Trousdale and Smith Counties, and by the chiefs of police of Carthage and Lafayette in September and October 2006, had never been approved by, or presented for approval by, the Smith County Commission. Furthermore, Mayor Nesbitt testified that the Interagency Agreement between the 21st District Drug Task Force and the 15th District Drug Task Force had never been approved by, or presented for approval by, the Smith County Commission. Upon cross-examination by the State, Mayor Nesbitt acknowledged that the budgets for Smith County for 2008-2009, 2007-2008, and 2006-2007 reflected payments of salary to Carlo Squanci, a deputy assigned to the 15th Judicial Drug Task Force.

As he did at the trial level, on appeal Defendant asserts that the 21st Judicial Drug Task Force was illegally operating outside of its authorized jurisdiction when Agents Campbell and Utley stopped Defendant, searched the vehicle he was driving, and arrested him. Defendant acknowledges that Tennessee Code Annotated section 8-7-110 authorizes the creation of drug task forces and permits mutual aid agreements between judicial districts,

or multi-judicial district task forces. However, he asserts that before any law enforcement officer can operate outside his or her base jurisdiction, the agreement must be approved by each county commission or municipal legislative body of the county or city providing officers to the respective task forces. Defendant relies upon Tennessee Code Annotated section 12-9-104, captioned "Interlocal agreements," which provides in pertinent part:

> . . . The governing bodies of such political subdivisions shall require agreements made by their agencies pursuant to this chapter to be submitted to the governing body for approval before the agreements take effect.
>
> (b) Any two (2) or more public agencies may enter into agreements with one another for joint or cooperative action pursuant to the provisions of this chapter. Appropriate action of the governing bodies of the participating public agencies by resolution or otherwise pursuant to law shall be necessary before any such agreement may enter into force.

Tenn. Code Ann. § 12-9-104(a)(2) and (b).

The trial court denied Defendant's motion to dismiss the indictment, based upon the Smith County Commission's vote to approve its County's participation in the Drug Task Force and upon the trial court's "reading of Title 8, Chapter 7" of Tennessee Code Annotated.

We conclude that this issue can be resolved without making a determination of whether the 15th Judicial District Drug Task Force was operating lawfully within Smith County, and without making a determination of whether the 21st Judicial District Drug Task Force was operating within its jurisdiction in Smith County on July 9, 2008, when Defendant was stopped and ultimately arrested. Assuming *arguendo* that the agents of the 21st Judicial District Drug Task Force were operating outside of their authorized jurisdiction as law enforcement officers on July 9, 2008, in Smith County, this alone does not entitle Defendant to relief on this issue.

In *State v. Johnson*, 661 S.W.2d 854 (Tenn. 1983), the defendant was stopped while a passenger in a pickup truck in Bledsoe County. The officer who initiated the stop, based upon information from a reliable informant and other information, was the Sequatchie County Chief Deputy Sheriff. The defendant argued that his seizure and search of the truck violated the defendant's constitutional rights. Included in the basis for this argument was that the Chief Deputy of Sequatchie County was acting without lawful authority when he detained the defendant in Bledsoe County. Our Supreme Court noted that Tennessee Code Annotated section 40-7-109 permits a private person to arrest another person under various

-12-

situations, including the one being considered by the Court. *Id*. at 859. Accordingly, the Supreme Court determined that since the Chief Deputy of Sequatchie County, acting as a private citizen, could detain the defendant in Bledsoe County, there was no need for the court to determine whether the chief deputy had been appointed a "special deputy" of Bledsoe County pursuant to Tennessee Code Annotated section 8-8-212. *Id.*

In *State v. Horace Durham*, No. 01C01-9503-CC-00056, 1995 WL 678811 (Tenn. Crim. App. Nov. 16, 1995) the defendant was arrested for DUI by an on-duty Cookeville police officer, who stopped the defendant outside of the statutory jurisdiction of the Cookeville Police Department. The officer acknowledged in his testimony that when he arrested the defendant, he arrested him while acting as a police officer and *not* as a private citizen. The defendant argued that all evidence gathered against him after the stop should be suppressed because the officer acted outside his lawful jurisdiction. This court quoted from *State v. Smith*, 695 S.W.2d 954, 959 (Tenn. 1985) that "[i]t is basic statutory law in this state that a private person may arrest another for an offense committed in the presence of the arresting individual, or for a felony not committed in his presence." *Durham*, at *2. This Court also rejected the defendant's argument that *Johnson* and *Smith* were inapplicable because each of those cases involved an arrest for a felony, and the defendant in *Durham* had only been arrested for a misdemeanor. This court held, "[w]e do not believe this is a meaningful distinction. The statute clearly authorizes a private person to arrest another person for any public offense committed in his presence." *Durham*, at *2. Similarly, this court rejected the defendant's assertion that since the officer was on duty, and the officer testified that he was *not* acting as a private person when he arrested the defendant, that the "private arrest" statute was inapplicable. The court said, "Again, we do not believe the distinction is meaningful. We conclude that a police officer does not give up the right to act as a private citizen when he is off duty or out of his jurisdiction." *Durham*, at *2 (citing *State v. Carey Wayne Fullerton*, No. 02-C01-9206-CC-00132, 1993 WL 236679 (Tenn. Crim. App. June 30, 1993) *perm. to appeal denied* (Tenn. Oct. 11, 1993)).

This court upheld the conviction in *Durham*, holding,

> We conclude that the Defendant herein was lawfully arrested by the city policeman even though the arrest was made outside of the officer's jurisdiction. We point out that it is clear that the officer had probable cause to stop the Defendant and to arrest him for DUI. *Because he acted outside of the police authority of the City of Cookeville, the officer acted as a private person* and as such, may have acted at his own peril.

*Durham*, at *2. (emphasis added).

This court has followed the reasoning in *Durham*, both as to an on-duty officer acting as a private person when making an arrest outside the officer's jurisdiction, and in stating that the officer may act at his own peril in doing so. *State v. Donnie Alfred Johnson*, No. 02C01-9707-CC-00261, 1998 WL 464898 (Tenn. Crim. App. August 11, 1998). In *Donnie Alfred Johnson*, an on-duty officer outside his jurisdiction stopped the defendant for speeding. *Id.*, at *1. *See also State v. Andrew John Bellamy*, No. E2003-02728-CCA-R3-CD, 2004 WL 2358099 at *4 (Tenn. Crim. App. Oct. 20, 2004)(on-duty police officer could lawfully stop and detain the defendant for speeding outside of the police officer's jurisdiction, because the officer was acting as a private person, even though when the police officer did so, he was acting at his own peril), *perm. to appeal denied* (Tenn. Mar. 7, 2005).

We do not have to determine whether Agents Campbell and Utley of the 21st District Drug Task Force were acting within their lawful jurisdiction when they stopped Defendant in Smith County on July 9, 2008. *Johnson*, 661 S.W.2d at 859. In fact, based upon this record, we explicitly make no determination as to the validity of either the 21st District Drug Task Force or the 15th District Drug Task Force operating within Smith County. We do conclude that under *Johnson*, *Durham*, *Bellamy*, and *Donnie Alfred Johnson*, and the cases cited therein, that Agents Campbell and Utley had the authority as private persons to take their actions concerning Defendant, even though they acted at their own peril in doing so. Defendant is not entitled to relief on this issue.

***The Initial Stop of Defendant***

***Validity of the Consent to Search***

***Did the Search Exceed the Scope of Consent, if Consent was Valid***

We will address together the above three issues presented by Defendant. Prior to trial, Defendant filed a "Motion to Suppress Evidence Seized." The motion is void of any specific factual allegations concerning Defendant's case, gives the appearance of a "boiler-plate" suppression motion, and states that the search and seizure violated Defendant's rights under the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Constitution of Tennessee. The motion then sets forth the following general allegations:

1. The search was without a search warrant and in the absence of exigent circumstances.

2. The search was the product of prior unlawful activity.

-14-

3. The evidence seized was not in "plain view" because the objects seized themselves were not in plain view, the officers had no right to be in a position for the view, the objects were not discovered inadvertently, and the incriminating nature of the evidence was not immediately apparent to the viewer.

4. The search violated the Defendant's reasonable expectation of privacy.

5. The search was conducted without probable cause.

6. The search was illegal because the vehicle was illegally stopped; was not a search incident to arrest, and the items taken were part of an illegal inventory.

7. The search was without lawful consent by the Defendant.

8. The search was the product of an unlawful stop because the officers had insufficient information to justify a stop; the officer's observations were insufficient to justify the stop; and the duration of the stop was excessive.

Our Supreme Court has set forth the applicable standard of review in this case:

On appeal from the denial of a motion to suppress, we defer to the trial court's findings of fact unless the evidence in the record preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The "credibility of the witnesses, the weight and value of the evidence, and [the] resolution of conflicts in the evidence are matters entrusted to the trial court as the trier of fact." *Id*. The prevailing party in the trial court is afforded "the strongest legitimate view of the evidence . . . as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id*.

. . . .

Both the federal and state constitutions protect against unreasonable searches and seizures. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Article I, section 7 of the Tennessee Constitution similarly guarantees "[t]hat the people shall be secure in their

-15-

persons, houses, papers and possessions, from unreasonable searches and seizures." "[U]nder both the federal constitution and our state constitution, a search without a warrant is presumptively unreasonable, and any evidence obtained pursuant to such a search is subject to suppression unless the state demonstrates that the search was conducted under one of the narrowly defined exceptions to the warrant requirement." *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005). One of the established exceptions to the warrant requirement is consent to search. *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996).

*State v. Brown*, 294 S.W.3d 553, 561 (Tenn. 2009) (footnote omitted).

We are able to dispatch summarily with Defendant's challenge to the legitimacy of the stop. A stop of a vehicle based upon probable cause that an offense is being committed is constitutionally valid. *State v. Vineyard*, 958 S.W.2d 730, 731 (Tenn. 1997). The officers in the case *sub judice* observed Defendant violating the speed limit on Interstate 40. Defendant's brief candidly states "[t]he author of this brief does not think for one moment the agents do not have probable cause at the point wherein the speed is recorded." Defendant further concedes that what the agents did was pretexual, but it is well settled that as long as there is probable cause or reasonable suspicion to stop a vehicle on a valid basis, it does not matter if that reason is pretexual to investigate for illegal drugs. *See State v. Orson Wendell Hudson*, No. M2004-00077-CCA-R3-CD, 2005 WL 639129, at *3 (Tenn. Crim. App. at Nashville, March 15, 2005) ("An officer's subjective intention for stopping a vehicle is irrelevant, as long as independent grounds exist for the detention.") (citing *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769 (1996); *State v. Vineyard*, 958 S.W.2d 730 (Tenn.1997)). Defendant does argue that the agents' reliance upon the "hot pursuit" exception was not valid. However, this is not the basis for the stop relied upon by the State. The stop of the vehicle Defendant was driving was constitutionally permissible.

With regard to the validity of Defendant's consent to search the vehicle, the State, for the first time on appeal, argues that Defendant lacked standing to contest the search, as he was not the owner of the vehicle, and although Defendant was driving, the owner was present and therefore left Defendant with no reasonable expectation of privacy in the vehicle. The State has waived a challenge to Defendant's standing. It was not raised in the trial court and therefore cannot be asserted for the first time on appeal. *See State v. White*, 635 S.W.2d 396, 399-400 (Tenn. Crim. App. 1982).

While he did not testify at the pre-trial hearings, Defendant did offer circumstantial evidence at the pre-trial hearings that Defendant would not have been able to understand English enough to knowingly and voluntarily give oral or written consent to search, and that

the Spanish portion of the written consent to search was so poorly written that valid consent was lost in the translation.

An expert witness in Spanish to English and English to Spanish translation, called as a witness by Defendant, testified as to what the Spanish consent form stated in English. She prepared a translation which would give the message to a non-Spanish-speaking person who speaks English, that is equivalent to what a non-English-speaking person who speaks Spanish would understand the message to be. All misspellings, word usage, grammar, and sentence structure are exactly as the witness provided in the translation. The words in Spanish were originally written in English on the Spanish consent to search form. It is as follows:

**Permiso en espanol**

I, _____, hereby give my consent to _____, Officers of the **Fuerzas Especiales Antidroga del Distrito Judicial 21** for them to search the following vehcle, including luggage, all manner of packages and its content. Respect to the following, the stirring [of] any suspicious deck and other [components] of the [vehicle] in the smallest way and to have access to any manufactured comparment with the prpose of hiding contraband.

_____
**Color**      **Anus**      **Make**      **Body Style**      **License plate number**

I understand that I have the right to refuse to consent to what is described here be serch and [refuse] to sign thus shape. Furthermor I declare that no promise, theat, force, or my coaccion to obligate me to consent to the search described here or for sign this shape.

Signatures: _____ Time: _____

1. _____ 2. _____

Letitia Mason, an attorney licensed to practice law in both Mexico and Tennessee, and a certified court interpreter for the Spanish language, certified through the Tennessee Administrative Office of the Courts, was called as a witness by the State and declared an expert witness by the court in translations from Spanish to English and English to Spanish. Also, Ms. Mason is a native of Mexico and Spanish is her first language.

Her translation of the Spanish language consent to search form signed by Defendant and by Mr. Gomez was somewhat different than the conclusions drawn in the interpretation by Defendant's expert witness. Ms. Mason acknowledged in her testimony that the form had

grammar mistakes, misspellings, and typographical errors. However, she read the form "as close as possible with the same errors in English to give [the Court] an idea of how it would sound." Ms. Mason did not prepare a written verbatim translation as the other expert witness did. Therefore, to understand her translation it is best to quote part of her testimony on direct examination:

MS. MASON:           I'm going to put the mistakes in English.

THE COURT:           All right, mistakes included. Read away.

A.                          It says, I, and the name here for - - do I - -

THE COURT:           General, let's have her read it all.

A.                          "I, Jose Martinez and Jose Gomez, through this document, give my consent to officers of the 21st Judicial District Drug Task Force," and that name was left in English, it's not in Spanish, "to search the following vehicle, including luggage, any type of packages and their content with regard to the following, removing any top," I'm sorry, "removing any suspicious top or cover and other component," it's missing one letter, the word component. In Spanish it's missing one letter.

Q.                          So that's a misspelling, right?

A.                          Yes.

[DEFENSE COUNSEL]:  It's not a misspelling, it's a mistake. I object to the mischaracterization.

THE COURT:           She's read it. She says it's missing a letter. Whatever you say, it's one thing, it says another, it goes to the weight right now. Go ahead.

A.                          - - "and other component of the vehicle in the most minimal way and to have access to any - - to any made or fabricated box with the purpose of hiding contraband." And then it says, "color,

-18-

year," and the word year in Spanish is missing a little thing. In the English language you don't have it in the alphabet.

Q. Is that the tilde above the - -

A. Yes. - - "make, body shop or body of the vehicle, and license plate number."

Q. Okay, let me stop you. Are there things filled in then in English above that?

A. Yes.

Q. And what does that say?

A. Silver for color, and then it says, '03 for the year, and then it says Volvo for make, and then it says XC90 for body shop - - body. I'm not sure about that word in English. I could look it up in my dictionary. And for license place [sic] it says, CA6DDB895.

Q. Thank you. Go ahead.

A. And then the second part says, "I understand that I have the right to refuse to consent to this charge." I'm going to say instead of search, because in Spanish the words are backwards. So I would read with the mistake in English, it would say, "and have the right to refuse to this charge that is here described or here above described, and to refuse to sign that form," instead of refuse to sign this form. Those two words are misspelled. So in English it would be, to refuse sign that form. It doesn't make sense.

Q. Which word is misspelled there? It is (speaks Spanish)?

-19-

A.	(Speaks Spanish), the first one, it's one letter that is wrong. And then (speaks Spanish) A-S-T-A, it needs an H at the beginning, but the sound would be the same in Spanish. And then it says, "I further declare that - - that there's no promise, threat," because the word Spanish (speaking Spanish) is missing one letter also, "or coercion of mind to force me to consent to the search here described, or to sign this form." And then it says, "signature and time."

Q.	So (speaking Spanish) - -

A.	(Speaking Spanish) is signature, (speaking Spanish) is time.

Q.	Okay. Are there names in below?

A.	Yes.

Q.	Read those names.

A.	Jose Amates Martinez on the left side, and Jose Gomez in the right side.

Ms. Mason acknowledged that the Spanish word actually intended to be used for the English word "year," as in the year of the vehicle, stated "anus." In her expert opinion, this was one of only two misspellings that literally changed the meaning of the intended word, the other misspelling was "asta" instead of the word "esta." "Asta" literally means "flagpole" in English. Ms. Mason testified,

[h]owever, when in the context, if you are reading this form in Spanish it would be easy to know that they misspelled the word. It wouldn't be reasonable to think of a flagpole with the word the way it is. But that's what it could mean the way it is.

As noted above, when Ms. Mason translated that pertinent portion of the consent form, it read, "to refuse to sign that form." The other mistakes, in her expert opinion, when read in context, conveyed to the Spanish-speaking reader the intended message of a consent to search a vehicle, including fabricated compartments, and the right to refuse consent.

-20-

Agent Utley was called as a witness by Defendant at the hearing on the motion to suppress. His only direct communication with Defendant at the scene was to read Defendant his *Miranda* rights, and Defendant did not respond as to whether or not he understood Agent Utley. Agent Utley did acknowledge in his testimony that he made a statement at the scene to the effect "I don't like it that he [Defendant] doesn't speak good English," and Agent Utley further clarified in his testimony that he was referring to Agent Campbell's communication with Defendant. Agent Utley explained his comment by saying that westbound drug-related traffickers (like Defendant) normally transport the money, and eastbound travelers normally transport the drugs; furthermore, Agent Utley noted that in his rather vast experience, money traffickers usually spoke fluent English, and his comment expressed his concern that Defendant did not have currency.

Agent Rios was also called as a witness by Defendant at the suppression hearing. The only pertinent proof offered in his brief testimony was that he spoke to Defendant in Spanish during a phone conversation at some point while the stop was in progress.

In its ruling denying Defendant's motion insofar as it asserted invalid consent, the trial court made the following findings:

THE COURT: I have to decide whether or not the consent in this case was voluntary and knowing. This is a preliminary question that I have to decide based upon a variety of principles. Both sides have outlined those and the law is pretty clear, but generally we're talking about voluntary and knowing consent.

So, I have to look at what I've seen here in this courtroom and the entire record that's before this Court. I've heard five witnesses testify in this case, in this portion of our pretrial hearings.

I heard from Agent Campbell who is the first officer to make contact with the Defendant in this case. I heard from Ms. Mason who was qualified as an expert in translation from Spanish to English and vice versa.

I heard from the defendant, Mr. Utley, and the other officer on the scene of the stop. I heard from Agent Rios with regard to the impeachment proof of what Mr. Utley supposedly said. I heard from Ms. Hayes who was also

-21-

qualified as an expert from Spanish to English and vice versa.

Now, everybody knows that I just can't isolate one thing. I have to consider all the proof that I've heard, and part of that proof is the video tape, which was from about 13:09 or 1:09 p.m. until it was turned off at 13:48 or 1:45, approximately forty minutes. The stop itself occurred in - - I'm not going to get into seconds, but approximately at 13:09.

There was some discussion between Mr. Campbell and this Defendant, and indeed the other gentleman in the vehicle at the car. Following that, the Defendant was asked to get out of the car. I saw the Defendant there. He produced a driver's license, insurance card.

There was some question about where he was going to where he was from, those kinds of things. He said that he has been in North Carolina. Could not remember the city at the time, but then produced the airline receipt.

It was loud out there on the interstate. I heard traffic going by and it was very loud in terms of the background noise. So I had to listen carefully to follow the conversation because of the background noise. But the important thing is, there was communication between Agent Campbell and the Defendant there up until the time that - - which is about 1:20 or 1:21 when there was a request made to search the vehicle.

Agent Campbell asked things like, do you have anything illegal in there, any drugs, or any large quantities of money, and the man said, no to each of those questions be they in the conjunctive or separate or singular questions.

This is after the agent had gotten back in the car, sometime around 1:15, give or take a minute, and had called what he referred to as BLOC. That's six minutes

roughly after the stop. And then he gets out, waiting for that return call from BLOC and that's when the oral conversation with regard to the search was [e]ffected.

This Defendant said, yes, to that search, and then based upon the documents that the agent had received, particularly the registration, he went up to Mr. Gomez who was the owner of the vehicle, and talked to him. I can glean from that that man likewise concurred that the officers could search the car orally and then this form was produced.

Now, quite frankly, this form is a mess. It really is. That's the best word that I can describe about the form. And if this had been all that had been out there, and there had been difficulty in communicating with regard to driver's license, insurance, the English questions about whether or not there was anything illegal in the car, if it had just been the form alone, I would be inclined to agree with the defense.

However, based upon the oral consent, coupled with the form, based upon the expert testimony of both experts in this case, I think that I can conclude, and I do conclude that this consent was likewise voluntary and knowing, both consents in effect, because I'm not going to look at them separately, but I think you have to look at them in the total setting out there on the highway, the interstate in this case.

So, accordingly, and indeed I note particularly there's no question as both experts did say there's no question that that second full paragraph, even includes the phrase, I understand that I have the right to refuse to consent. There's no question about that to what is described here.

And then also, below the signature lines it clearly says, signature of person who gives permission. So I think given the totality of the document, this consent to search form, that a reasonable person in the Defendant's

position after having been asked orally about consent could conclude that that's what the form purports to do, to give that written permission to consent.

So accordingly, with all due respect, as to this issue, I will overrule and deny your motion to suppress.

[Defense Counsel]: What about the issue of the scope, your Honor.

THE COURT: The scope as well. I find specifically - - I heard Agent Campbell outline when he first opened the car door he saw [an] oddity in and around - - there was a separation between the plastic, the carpeting, that area, and he also noticed those bolts, that based upon scratches were irregular based upon his experience in conducting searches or looking at vehicles. And so I likewise overrule on that ground.

Specifically I'm inclined to follow along with the form in that regard about the refusal to consent. I just think that overall, based upon what they saw there, that they had reason to look further, and even though they had to get some tools, that, I don't think, is anymore intrusive based upon that observation that he saw, and it was a reasonable intrusion into the - - below the seat itself. So with all due respect, sir, I'll overrule your motion to suppress on all grounds.

In situations, such as we have here, when there is a warrantless search, the burden is on the State to demonstrate "that the search was conducted under one of the narrowly defined exceptions to the warrant requirement." *Cox*, 171 S.W.3d at 179. "Well settled among the exceptions to the warrant requirement . . . is consent to search." *Id*.

We agree with the trial court's determination that Defendant gave a valid consent to search the vehicle. In addition, even if there had been some question about the validity of Defendant's consent, there was no relevant evidence put forth by Defendant which overcame the evidence demonstrated by the State that the vehicle's passenger and registered owner, Mr. Gomez, gave valid oral and written consent to search the vehicle.

-24-

As to Defendant's assertion that the search exceeded the scope of any valid consent, the State correctly points out that this theory of relief was not included within Defendant's motion to suppress evidence. The State also correctly cites Tennessee Rule of Criminal Procedure (12)(f)(1) as authority for the proposition that failure to raise a suppression issue pre-trial results as a waiver of the right to raise the issue on appeal. *See also* Tenn. R. App. P. 36(b). The State is incorrect in its latter assertion, on appeal, that Defendant has waived the right to assert on appeal that the search exceeded the scope of the consent. While the written motion did not allege this ground, Defendant clearly raised this issue orally in the trial court; in the trial court, the State addressed the merits of the issue with no complaint that this precise issue was not included in the written motion. Thus, it is the State, and not Defendant, which has waived the right to assert a specific argument on appeal.

Nevertheless, addressing the merits of the issue, we again agree with the trial court that the search did not exceed the scope of the consent in the written form, signed by both Defendant and the passenger/registered owner, Mr. Gomez. "In determining the scope of consent, the relevant considerations include any express or implied limitations regarding the time, duration, area, or intensity of police activity necessary to accomplish the stated purpose of the search." *State v. Troxell*, 78 S.W.3d 866, 876 (Tenn. 2002). Specifically, Defendant asserts that using tools to remove bolts and break open the fabricated door went beyond the scope of the consent. As we understand the trial court's ruling, at the point Agent Campbell observed irregularities in the molding covering the bolts, and then scratches on the bolts, based upon his knowledge and experience, he had probable cause at that time to search further, even if the scope of the search was arguably limited. In addition, the trial court implicitly accredited the testimony of the State's expert witness as to the overall understandability of the Spanish language consent form in the context of the total circumstances, even if the trial court did conclude the form was a "mess." The State's witness testified that even with the mistakes, a Spanish-speaking person would understand that the consent form allowed the search to include looking into fabricated compartments.

Defendant is not entitled to relief on these issues concerning the stop, the validity of the consent to search, and the scope of the consent.

### Testimony of Agent Rios Regarding the Street Value of Heroin

Defendant argues that the trial court erred by allowing, over his objections, Agent Rios to testify that the retail street value of the heroin seized in this case was approximately 1.2 million dollars. He argues that the evidence was not relevant, and even if relevant, was unfairly prejudicial, and misleading, and therefore still inadmissible.

Generally, the admission of evidence at trial is entrusted to the broad discretion of the trial court, and as such, a trial court's ruling on the admission of evidence where relevance is questioned may only be disturbed upon a showing of an abuse of that discretion. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004) (*citing State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)). The trial court's exercise of discretion may not be reversed unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997). For evidence to be admissible, it must be relevant. Tenn. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. A court may, however, exclude relevant evidence if the danger of unfair prejudice substantially outweighs its probative value. Tenn. R. Evid. 403.

Tennessee courts have consistently found that the value of illegal drugs is relevant to establish a defendant's intent to sell or deliver. *State v. Matthews*, 805 S.W.2d 776, 782 (Tenn. Crim. App. 1990); *State v. Toney L. Conn*, No. M2005-02899-CCA-R3-CD, 2006 WL 3498048, at *5 (Tenn. Crim. App. Nov. 21, 2006) *perm. to appeal denied* (Tenn. Mar. 12, 2007); *State v. Wayne Miller*, No. W2005-00678-R3-CD, 2005 WL 3447707, at *4 (Tenn. Crim. App. Dec. 16, 2005). The trial court acted within its discretion in allowing testimony establishing the street value of the drugs seized from the vehicle driven by Defendant.

Defendant is not entitled to relief on this issue.

### Introduction of the TBI Crime Laboratory Report into Evidence

Over Defendant's objection, the trial court admitted into evidence the Tennessee Bureau of Investigation (TBI) Crime Laboratory report which showed the substance seized from the vehicle was heroin, and the weight of the heroin. The basis of Defendant's objection was that the laboratory report was not provided to Defendant pre-trial pursuant to timely and appropriate discovery requests. The State does not dispute that neither the lab report itself nor a copy of it was shown to Defendant before trial, but it asserts that the failure to comply with the rules of discovery was inadvertent. Defendant, on the other hand, does not dispute the State's assertion in the trial court, and on appeal, that the State timely notified Defendant of a TBI lab report pending after the substance had been sent for analysis. Also, Defendant knew that the witness from the TBI Crime Lab would be called to testify for the State, although she was identified as a TBI Special Agent with no mention of being a forensic scientist. Defendant's counsel made it clear that a mistrial was *not* being requested, and the only relief being asked for was the exclusion of the laboratory report as an exhibit and the exclusion of the TBI Crime Laboratory forensic scientist as a witness. In other

words, Defendant wanted the trial court to prevent the State from putting on any proof that the substance was, in fact, heroin.

As a remedy for the State's discovery violation, the trial court stopped the trial for the day, to be resumed the next morning, and had the forensic scientist remain in the courtroom to be available to be interviewed by defense counsel. The trial court specifically found that there was no prejudice to Defendant.

We note that Defendant's counsel filed at least one motion to compel discovery and sent a letter to the district attorney's office requesting copies of certain specific documents or other items, such as cell phone records, surveillance records, interlocal or mutual aid agreements, and other items they knew, or reasonably expected, to exist. Counsel never, however, pushed in a like manner for a copy of the crime laboratory report, even though counsel knew the State had sent the heroin to the crime laboratory for analysis. In fact, in Defendant's brief it is stated, "[like we all do in the defense business, we rely on the D.A.'s [sic] office to let us know when the lab results are back because we all too often hear the TBI has it."

When a party, in this case the State, fails to fully comply with the rules of discovery, Tennessee Rule of Criminal Procedure 16(d)(2) provides that the trial court "may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances."

The remedy provided by the trial court in this case for the State's inadvertent transgression fully complied with what Tennessee Rule of Criminal Procedure Rule 16(d)(2) provides "may" be done by a trial court. Defendant is not entitled to relief on this issue.

## CONCLUSION

Having addressed the issues presented by Defendant and finding no reversible error, and that the evidence was sufficient to support the conviction, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE