# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 11, 2015 Session

## STATE OF TENNESSEE v. MARCUS THURMAN WADE

**Direct Appeal from the Circuit Court for Coffee County**
**No. 38,622     L. Craig Johnson, Judge**

---

**No. M2014-01418-CCA-R3-CD – Filed September 28, 2016**

---

A jury in the Coffee County Circuit Court found the Appellant, Marcus Thurman Wade, guilty of the first degree premeditated murders of Richard Elliott and Timothy Gill, the felony murders in the perpetration of aggravated robbery of Mr. Elliott and Mr. Gill, and the especially aggravated robbery of Mr. Elliott. The trial court merged the premeditated murder convictions and the felony murder convictions and imposed a total effective sentence of life without the possibility of parole plus thirty-five years. On appeal, the Appellant challenges (1) the sufficiency of the evidence sustaining his convictions, (2) the trial court's decision to allow testimony regarding a prior bad act of the Appellant, (3) the trial court's refusal to give the pattern jury instruction on circumstantial evidence that was in place at the time of the offenses, and (4) the trial court's ruling on the Appellant's motion to suppress his statement. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Robert T. Carter (at trial and on appeal) and Judith St. Clair (at trial), Tullahoma, Tennessee, for the Appellant, Marcus Thurman Wade.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; C. Michael Layne, District Attorney General; and Jason Michael Ponder, Felicia B. Walkup, and Marla R. Holloway, Assistant District Attorneys General, for the Appellee, State of Tennessee.

# OPINION

## I. Factual Background

The Appellant's convictions stemmed from the shooting deaths of Richard Elliott and Timothy Gill. The proof adduced at trial revealed that at 10:08 a.m. on October 30, 2010, Coffee County 911 received a call reporting that the victims' bodies had been found in room 123 of the Quality Inn in Tullahoma. When the police arrived, they went into the room and found the victims' bodies. The door showed no signs of forced entry, and the inside of the room showed no signs of a struggle, which led the police to believe that the victims knew the perpetrator or that the perpetrator had a key to the room. Mr. Elliott was lying on his back on the bed closest to the door, and Mr. Gill was lying on his back on the other bed. Mr. Elliott, who weighed 233 pounds, was wearing exercise shorts and socks but no shirt. Mr. Gill, who weighed 372 pounds, was wearing bib overalls and socks. Paramedics arrived and determined that the victims were dead.

The police searched the room but did not find any weapons. They found one bullet hole in the headboard of the bed on which Mr. Elliott was lying, and another bullet hole was in the wall between the two beds. Two nine-millimeter shell casings and two bullets were found in the room. Mr. Gill had thirteen dollars in his pockets, but Mr. Elliott had no money. The police found Mr. Gill's cellular telephone and a cellular telephone belonging to Mr. Elliott's stepdaughter, but Mr. Elliott's cellular telephone was never found. Officer Kennedy said that a "crack pipe" and a bag containing 1.08 grams of crack cocaine were discovered in the room, but he did not specify where. The only fingerprints found in the room belonged to the victims.

During the investigation, the police learned that Ronald and Sharon Nixon, who discovered the victims' bodies, knew both men. Mr. Gill was the best friend of the Nixons' son, Ray. Mr. Elliott also was friends with Ray Nixon and occasionally did odd jobs for the Nixons.

Ronald Nixon testified at trial that around the end of July 2010, Mr. Elliott asked Mr. Nixon to "front" him money, explaining that he was supposed to receive an inheritance of cash and land and that he would repay the money when the legal proceedings concluded. Mr. Nixon agreed to provide money for Mr. Elliott's room, board, transportation, and cellular telephone "until this estate was settled." Mr. Nixon said that he could not help Mr. Elliott on a long term basis but that he wanted to help Mr. Elliott change his life.

In early September 2010, Mr. Elliott told Mr. Nixon that "that he was going on the payroll of the Winchester Police Department. Mr. Nixon described Mr. Elliott as

"evasive" about his job, but he eventually revealed that he was going "to go out as an informant and trap people" and that Mr. Gill was going to help him on one of the jobs.

Mr. Nixon said that he kept "track" of all of the money he spent on Mr. Elliott. On October 28, 2010, Mr. Nixon wrote Mr. Elliott a check for $2,000, and the next day wrote another check for $2,150. Additionally, Mr. Nixon spent over $1,000 for Mr. Elliott to stay in a room at the Quality Inn in Tullahoma for almost the entire month of October 2010. Occasionally, Mr. Elliott's wife, Mitzi Elliott, and Mr. Gill stayed in the room with him. The total amount Mr. Nixon gave Mr. Elliott was approximately $44,000.

Around 9:00 a.m. on October 30, the Nixons went to Ascend Federal Credit Union to meet with Mr. Elliott in order to complete a "real estate deal" that would result in money being deposited into Mrs. Nixon's account. They waited for Mr. Elliott until 9:20 a.m. and then called him but got no answer. They left and drove by Mr. Gill's house and Richard Elliott, Jr.'s house. Eventually, they stopped at the motel when they saw Mr. Elliott's van in the parking lot. Mr. Nixon knocked on the door of room 123 but received no response. He went to the motel office, and Rakish Patel, the motel manager, authorized issuing Mr. Nixon a key.

Mr. Nixon returned to the room, opened the door, and saw the victims lying on the beds in the room. Mr. Nixon did not see any blood and thought the victims were passed out or asleep. He pushed Mr. Elliott's stomach to wake him and noticed that he was cold. Mr. Nixon also attempted to wake Mr. Gill. Mrs. Nixon, who was a registered nurse, checked on the victims, discovered they were "stiff and cold," and confirmed they were deceased. Mrs. Nixon exited the room and called 911.

On November 1, Mr. Nixon met with Floyd Davis, who was supposedly Mr. Elliott's attorney. Mr. Davis told Mr. Nixon that there was no inheritance. At that point, Mr. Nixon realized "that it was a scam." Mr. Nixon acknowledged that Mr. Elliott previously had "scammed" him on a car deal.

The medical examiner determined that both victims died instantly from a perforating gunshot wound to the head. The shots were fired from a distance over six feet. Mr. Gill had another gunshot wound to his right arm. Toxicology reports showed that both victims tested positive for cocaine and alcohol.

During the investigation into the victims' deaths, the police learned that the victims had spent several months setting up controlled drug buys and acting as confidential informants for the Winchester Police Department. As a result of their work, several people, including Anthony Hill, the Appellant's nephew; JaCarl Fuqua; and

Casey Tarrant, were indicted for felony drug offenses. The Appellant, however, was not charged.

Viola Stephens, Mr. Gill's aunt, testified that the victims came to her house around 7:40 p.m. on October 20, 2010. They had been drinking but were not drunk. Mr. Elliott told Ms. Stephens that he wanted some crack cocaine but could not find anyone willing to sell it to him. Mr. Elliott "flashed a bundle of money," and Ms. Stephens knew he could pay for the drugs. Ms. Stephens asked who his supplier was, and he replied that it was the Appellant. Ms. Stephens called the Appellant and asked if he knew Mr. Elliott and if he would "serve" Mr. Elliott. The Appellant replied "yes" and came to her house five or ten minutes later. He and Mr. Elliott went into the kitchen for the transaction. Afterward, the Appellant left, and Mr. Elliott, Ms. Stephens, and Mr. Gill smoked some of the crack cocaine Mr. Elliott had purchased. Ms. Stephens thought they did not smoke all of the crack cocaine because Mr. Elliott "wadded" something up and "put it in his pocket" after they finished smoking. Five or ten minutes later, the victims left. Ms. Stephens left to spend the night at her boyfriend's residence.

The next morning, Ms. Stephens's boyfriend drove her home. Later, her son called and told her that the victims were dead. Ms. Stephens called the Appellant and asked if he had "bother[ed her] family." The Appellant responded that he had not bothered them and that he "didn't go to Tullahoma[.]" Ms. Stephens said that she had not mentioned Tullahoma. Ms. Stephens's testimony was consistent with her interview with Officer Kennedy on March 3, 2011.

Richard Elliott, Jr., testified that at around 10:00 or 11:00 p.m., the victims came to his house and asked him to drink a beer with them. Mr. Elliott, Jr., agreed to drink one beer with them. Mr. Elliott, Jr.'s girlfriend and his children were in the house, and the victims visited with them. During the visit, Mr. Elliott "counted out" $2,100 in cash, "showing off."

Mr. Elliott, Jr., was concerned about the victims' driving while they were intoxicated and offered to let them stay at his house. The victims declined the offer. Before they left, Mr. Elliott made a telephone call. Mr. Elliott, Jr., did not know whom he called but heard him "trying to explain directions of how to get to Tullahoma to where he was at." Mr. Elliott told his granddaughter that he would be at her birthday party the next day. Mr. Elliott, Jr., estimated that the victims were at his house thirty to forty-five minutes. They left in Mr. Elliott's white van.

Officer Kennedy viewed the security video of the Quality Inn's lobby. The video showed that Mr. Elliott came into the office at 11:48 p.m. to reactivate the card key for his motel room.

The police examined Mr. Elliott's cellular telephone records and learned that between 7:45 p.m. on October 29 and 12:27 a.m. on October 30, twenty-two "communications" occurred between the Appellant and Mr. Elliott. Half of the communications were initiated by Mr. Elliott, and the others were initiated by the Appellant. The last call from Mr. Elliott's telephone was made at 12:27 a.m. on October 30 to the Appellant's cellular telephone. At the time the call was made, both telephones were accessing the same cellular tower. At 12:53 a.m. on October 30, 2010, a call was made from the Appellant's telephone to Mr. Hill's telephone. Mr. Hill's telephone number was saved in the contact list of the Appellant's telephone under Mr. Hill's nickname, "Black."

Casey Tarrant testified that sometime during the day of October 29, 2010, the Appellant, the Appellant's nephew, Mr. Hill, Mr. Fuqua, Rontye Gray, and he were at Mr. Gray's house. They discussed the potential five-year prison sentences Mr. Tarrant and Mr. Hill were facing if convicted of the drug charges. Mr. Tarrant said that he was worried about going to prison, and the Appellant responded, "'Don't worry about it. Everything is going to be all right.'" Mr. Hill, who was upset that he had been set up by Mr. Elliott, said that "he had money for – if something would happen to" Mr. Elliott. The Appellant said, "'I got you.'"

Mr. Tarrant testified that after leaving Mr. Gray's house, he went to Ernie Mill's house. While there, he saw the Appellant and Timica Jones. Mr. Tarrant thought that the Appellant and Ms. Jones left Mr. Mill's house in a silver "van or some kind of vehicle." In early February 2011, Officer Kennedy interviewed Mr. Tarrant. The information Mr. Tarrant gave largely mirrored his trial testimony.

On January 12, 2011, Winchester Police Officer Jason Kennedy and Detective Chris Layne interviewed Timica Jones, the Appellant's girlfriend. Ms. Jones initially was not "very forthcoming with information," but eventually she acknowledged that she and the Appellant went to the Quality Inn on the night of the offenses. Ms. Jones told the officers that afterward, the Appellant discarded a gun at the side of a road near the top of Sewanee Mountain. Approximately one week later, Officer Kennedy and other officers went to Sewanee Mountain with Ms. Jones to search for the gun, but they were unable to locate it.

Ms. Jones testified that she and the Appellant went "riding around" together on the night of October 29. The Appellant was wearing a black jacket and blue jeans and was driving his mother's white, four-door car. They drove on a back road toward Tullahoma and met a man Ms. Jones had never seen before that night. Another man was in the vehicle with him. The Appellant sold the man crack cocaine. Afterward, the Appellant and Ms. Jones went to the Appellant's mother's house on Elm Street in Winchester. The Appellant went inside the house to check on his mother, and Ms. Jones waited in the car.

When the Appellant returned, they drove to Walmart in Winchester, and the Appellant bought a "pay-as-you-go" cellular telephone. After leaving Walmart, they went to Sonic.

After they ate, the Appellant and Ms. Jones went to a trailer park in Tullahoma. The Appellant got out of the car and visited his brother for approximately five minutes. When the Appellant returned, they drove to the Quality Inn in Tullahoma. The Appellant backed into a parking space and got out of the car. Ms. Jones waited in the car. She had seen the Appellant with a gun earlier that evening, knew he routinely carried a gun, and thought he had the gun with him when he got out of the car. Shortly after the Appellant left, Ms. Jones heard two distant "pops" that sounded like fireworks. She looked around but saw nothing.

Ms. Jones said that the Appellant returned to the car carrying something that appeared to be a "touchscreen" cellular telephone. When he got into the car, he leaned toward the back seat and seemed to be putting something in a bag. They left the motel and drove to the Appellant's mother's house. Mr. Hill was driving away as they arrived. The Appellant waved at Mr. Hill but did not speak with him. The Appellant took the bag from the back seat and went into the house. Approximately ten minutes later, the Appellant returned to the car with the bag and told Ms. Jones that they were "fixing to ride for a while." Ms. Jones said okay, and they drove toward Cowan. Ms. Jones testified that she did not see the stolen cellular telephone again, but she knew that he threw it away as they drove past North Lake Elementary School.

Ms. Jones recalled that they were stopped for speeding in Cowan.[1] As the officer was walking toward the car, the Appellant reached into the back seat. Ms. Jones did not look, but she heard a bag rattling in the back seat. After the stop, the Appellant drove up Sewanee Mountain and threw a bag out the window. Ms. Jones did not see what was in the bag. They stopped at a gasoline station/convenience store in Monteagle, and the Appellant purchased cigarettes and drinks. He asked Ms. Jones to rent a motel room in Monteagle in her name and gave her cash to pay for the room. They went to the room and watched television, then Ms. Jones slept, and the Appellant took a shower. After "a while," the Appellant woke Ms. Jones, saying, "Let's go." They left the motel and drove toward Chattanooga. It was still dark outside when they stopped at a house. Ms. Jones did not know the person who was there. While they were at the house, the Appellant and Ms. Jones had sex, then Ms. Jones slept for a while. They left the house near daylight and drove to South Pittsburg. The Appellant stopped for gasoline and went into a store. They drove to the nursing home in South Pittsburg where the Appellant's stepfather lived, and the Appellant visited his stepfather for approximately twenty minutes. Afterward, the Appellant and Ms. Jones returned to Winchester. He asked her where he

---

[1] Cowan Police Officer James Wrisner confirmed that he stopped the Appellant for speeding at 1:25 a.m. on October 30, 2010, and that a white female was in the Appellant's car at the time.

could rent a car, and she told him about a place in Estill Springs. They drove to Estill Springs, rented a van, and then returned to his mother's house. They left the car at the house, and the Appellant took Ms. Jones home in the van. The police verified the route Ms. Jones and the Appellant took on the night of October 29 and on October 30 by examining their cellular telephone records.

Ms. Jones said that after she arrived home, she went to her room and slept. When she woke, it was dark outside. Her mother told her to look at a television news report about a murder in a motel room in Tullahoma. The report showed the victims' photographs, and Ms. Jones saw that one of the victims was the man who had bought cocaine from the Appellant on the back road. Ms. Jones told her mother that she and the Appellant had been at that motel the previous night. Ms. Jones "started putting 2 and 2 together . . . and . . . freaking out." She called the Appellant and asked about the news report. The Appellant "told [her] to shut up, he didn't want to hear it and not to speak of it again, and if [she] did, [she] would come up missing." Ms. Jones did not call the police because she was afraid.

Officer Jason Kennedy testified that on February 15, 2011, Agent Kendall Barham and he interviewed the Appellant. They advised the Appellant of his <u>Miranda</u> rights, and he was cooperative. Officer Kennedy told the Appellant that the police were investigating the homicides of the victims. The Appellant said that he did not know the victims and would not recognize them from a photograph. During the interview, however, the Appellant referred to Mr. Gill as "the bigger one." The Appellant said that he was with Ms. Jones on October 29 and that they were stopped by a police officer in Cowan. The Appellant said that he was in Cowan all night and was not in Tullahoma. He denied knowing before the victims' deaths that they were responsible for "setting up" Mr. Hill. The Appellant acknowledged that he sold crack cocaine and that he may have sold crack cocaine to Mr. Elliott through Viola Stephens, who was Mr. Gill's aunt. The interview, which had been videotaped, was shown to the jury.

On February 25, 2011, Officer Kennedy, Federal Bureau of Investigation (FBI) Agent Richard Poff, and Winchester Police Chief Dennis Young transported the Appellant from Winchester to Chattanooga. The Appellant was advised of his <u>Miranda</u> rights. Officer Kennedy told the Appellant that the police knew about the Appellant's movements before, during, and after the murders. Agent Poff watched the Appellant during the conversation. When Officer Kennedy said that the police knew the Appellant had been at Mr. Gray's house with Mr. Gray, Mr. Hill, Mr. Fuqua, and Mr. Tarrant, the Appellant nodded, "acknowledging that he had been at Mr. Gray's residence."

Officer Kennedy told the Appellant that the police knew he sold crack cocaine to Mr. Elliott in the afternoon before the murders. The Appellant again nodded affirmatively. Officer Kennedy told the Appellant that the police knew he ate a

hamburger at Sonic, that he bought a new cellular telephone at Walmart, and that he and Ms. Jones drove his mother's vehicle to the Quality Inn. The Appellant "nodded his head affirmatively up and down, acknowledging that he had done each of those things." Officer Kennedy said that he told the Appellant that the police knew the Appellant threw a cellular telephone and a gun out the window of the vehicle as he was driving from Tullahoma. Officer Kennedy described the drive through Winchester and Cowan, up Sewanee Mountain, and the stop at a nursing home in South Pittsburg. Chief Young also revealed that the victims were shot. The Appellant said, "'Yeah,' and nodded his head."

Agent Poff testified that before they left the jail, the Appellant was read his <u>Miranda</u> rights. He told the Appellant that "different people had different motives for killing someone, and . . . said that there was a difference between killing someone simply to rob a person or killing someone to avenge a relative." Agent Poff asked the Appellant if he had killed the victims to avenge a relative or just to rob them. At that point, the Appellant's "eyes filled up with tears, and he nodded his head forward twice, acknowledging that the reason he had killed them was to avenge a relative." Officer Kennedy noted that the Appellant "had previously said he would never hurt anyone unless they had harmed his family" and asked if the Appellant had killed the victims to protect Mr. Hill. Again, the Appellant "nodded his head forward, acknowledging that was why he had killed them."

Chief Dennis Young testified he told the Appellant the police had heard that Mr. Fuqua acquired the gun used in the murder, that Mr. Fuqua gave the gun to Mr. Hill, and that Mr. Hill gave the gun to the Appellant. The Appellant did not react to Chief Young's statement. Chief Young said the police had heard that Mr. Fuqua and Mr. Hill each paid the Appellant $2,500 to kill the victims. The Appellant responded, "'I didn't get paid.'"

Chief Young told the Appellant that he understood the Appellant's wanting to protect his nephew, Mr. Hill, but that he did not understand the Appellant's protecting Mr. Fuqua, who was not a relative. The Appellant replied, "'I will take care of it when I get out.'" Officer Kennedy asked the Appellant to provide some details about the murders, and the Appellant asked for an attorney. At that point, the questioning ended. Ten or fifteen minutes later, the Appellant "pronounced that anyone that he had ever laid hands on is still walking and that he had not killed anyone."

Kimberly Eddings testified at trial that a couple of weeks prior to the murders, she went "riding around" in Tullahoma with the Appellant, who was her boyfriend at the time, and Ernie May. They drove to the Quality Inn and saw a white minivan parked in the motel parking lot. The Appellant said that "he was going to hit a lick," which Ms. Eddings thought meant he intended to rob someone. The Appellant was wearing a dark

blue or black hoodie with the hood up. He and Mr. May put on gloves, got a knife, exited the car, and walked upstairs to a motel room. Ms. Eddings stayed in the car.

Mrs. Elliott, the victim's wife, testified that she and her niece were in Mr. Elliott's motel room on the "top floor" at the Quality Inn. Mrs. Elliott heard a knock and opened the door. Mr. May and the Appellant inquired as to Mr. Elliott's whereabouts, and Mrs. Elliott responded that he was not in the room and that they could return later. She tried to close the door, but the men stopped her. Shortly thereafter, the men returned to the car and left with Ms. Eddings. Ms. Eddings testified that the Appellant and she ended their relationship shortly after the attempted robbery, and the Appellant and Ms. Jones began dating.

Terry Whitaker, who was serving a sentence in a federal prison in Kentucky for selling crack cocaine, testified that in November 2011, he was housed in a federal holding facility in Bradley County and that he shared a cell pod with the Appellant. The Appellant told Mr. Whitaker that he went to a hotel room and shot two people who were confidential informants. The Appellant said that a female was waiting for him in the car and that he drove away after the shooting. The Appellant said that "he did it for somebody else, one of his family members and all of that." Mr. Whitaker recalled that the family member's "name was A. Hill or something like that, Andrew Hill or something, A. Hill something."

Shannon Quintel Pentecost, who was serving a sentence in a federal prison in Arkansas for selling crack cocaine, testified that he had known the Appellant for many years. Just after Halloween 2010, the Appellant called Mr. Pentecost and said he needed to talk. Mr. Pentecost told the Appellant that he was at a friend's house and that the Appellant should come to the house. When the Appellant arrived, the Appellant got into a car with Mr. Pentecost, and they smoked marijuana. The Appellant told Mr. Pentecost, "'Man, I f[***]ed up.'" Mr. Pentecost asked what was wrong. The Appellant responded, "'Man, me and Mica was going through so much. I should have knocked her off, too.'" Mr. Pentecost asked, "'For what?'" The Appellant said, "'Because she was there when I murdered those white guys.'" The Appellant told Mr. Pentecost that he needed "something," and Mr. Pentecost gave him some crack cocaine. The Appellant told Mr. Pentecost that he shot the two white men in the head and "made it look like it was suicide."

Mr. Pentecost said that in January 2012, he told the police about his conversation with the Appellant. On April 11, 2012, he gave a second statement to the authorities. In the second statement, Mr. Pentecost said that the Appellant said that the shooting occurred at a hotel in Manchester.

Terry Elliott, Mr. Elliott's brother, testified for the Appellant that he went to the Quality Inn around 10:00 or 10:30 a.m. on October 30, 2010. After he arrived, he learned that Mr. Nixon had found the victims' bodies. Mr. Nixon told Terry Elliott that he went through Mr. Elliott's pockets before the police arrived, looking for Mr. Elliott's mother's telephone number.

On cross-examination, Terry Elliott said that he did not tell the police that Mr. Nixon mentioned going through Mr. Elliott's pockets. He said, however, that he thought Mr. Nixon had already disclosed that information to the police.

Ellen Meeks testified that in the fall of 2010, she was working at Dunlap's Market, which was located on Highway 130 between Winchester and Tullahoma. Ms. Meeks knew Mr. Elliott and said that "[a]ll [she] really knew about him [was that] he partied a lot and drank." She said that Mr. Elliott was a drug addict and often was intoxicated when he came into the store. Mr. Elliott typically came into the store to cash checks. The checks usually were for $500 or more and written by Mr. Nixon, who was a frequent customer of the store. Ms. Meeks said that approximately three months before Mr. Elliott's death, his visits became more frequent, sometimes as often as three times a day.

Ms. Meeks said that she had seen Mr. Elliott and Ray Nixon together "a handful of times" in the months before Mr. Elliott's death. On one occasion, Ray Nixon was upset and angry that his father gave money to Mr. Elliott but would not give any money to him.

Rakish Patel testified that other guests stayed in the same wing of the Quality Inn as the victims on the night of October 29, 2010. None of the guests lodged a noise complaint that night.

Based upon the foregoing, the jury found the Appellant guilty of the first degree premeditated murders of Mr. Elliott and Mr. Gill, the felony murders of Mr. Elliott and Mr. Gill, and the especially aggravated robbery of Mr. Elliott. The trial court merged the first degree premeditated murder convictions and the felony murder convictions into a single conviction for each victim. The Appellant was sentenced to concurrent sentences of life without parole for the murder convictions and thirty-five years for the especially aggravated robbery conviction, with the sentence to be served consecutively to the murder convictions.

On appeal, the Appellant challenges the sufficiency of the evidence sustaining his convictions, the trial court's decision to allow Kimberly Eddings to testify regarding a prior bad act of the Appellant, the jury instruction on circumstantial evidence, and the trial court's ruling on the Appellant's motion to suppress the statement he gave to Officer Kennedy and Agent Barham.

## II.  Analysis

### A.  Motion to Suppress

Prior to trial, the Appellant filed a motion to suppress his statement to Officer Kennedy and Agent Barham, arguing that the officers should have stopped all questioning after he asserted his Fifth Amendment right to remain silent.  At a hearing on the motion, the parties relied solely on the video of the statement, which shows that when the officers joined the Appellant in the interview room at the jail and sat at the table with him Officer Kennedy told the Appellant that they were investigating the victims' deaths and asked if the Appellant could provide any information regarding the crimes.  Officer Kennedy advised the Appellant of his Miranda rights and asked the Appellant if he understood his rights, and the Appellant responded affirmatively.  Officer Kennedy asked if the Appellant had any problem talking to the officers, and the Appellant said, "Yeah.  It ain't nothing against y'all, but like you just said, I'm in jail.  And they're not treating me too good right now."  Officer Kennedy asked, "They're not treating you good?" and the Appellant replied, "They're not treating me good at all."  Officer Kennedy asked which agency was mistreating the Appellant, and the Appellant said that it was the Winchester Police Department.  The Appellant said that he would not mind helping Officer Kennedy and Agent Barham and that he had nothing against them; however, Winchester police officers had threatened to beat him, and a $100,000 bond had been set to ensure that he stayed in jail.  While he was incarcerated and unable to take care of his mother, she fell and was taken to the hospital.  The Appellant explained that he lived with his mother and was reponsible for taking care of her.

Agent Barham told the Appellant that he and Officer Kennedy met the Appellant's mother when they went to her house to see the Appellant.  The Appellant was not at home, but they spoke with his mother.  She told the officers that the Appellant took good care of her.  Agent Barham asked the Appellant if his brothers could help take care of his mother while the Appellant was incarcerated.  The Appellant replied, "Evidently not," and said that one of his brothers lived in Chicago.

At that point, Officer Kennedy mentioned that he was born in Chicago and that he knew the Appellant had lived in Chicago.  The Appellant began laughing and talking with the officers about the neighborhoods where he and Officer Kennedy were born.  He then asked Officer Kennedy, "[A]re you a Cubs fan or a White Sox fan?"  Officer Kennedy responded, "I'm going to have to say the Cubs."  The Appellant, who was a Cubs fan, laughed and told Officer Kennedy that he had "just won one free question."  Officer Kennedy did not ask a question at that time.  Instead, the three men talked about the Chicago Cubs, visiting Wrigley Field, eating at Harry Carey's restaurant, the Chicago Bears, Jay Cutler, and then moved on to other sports for a while.  The Appellant said that he was not able to visit Chicago often because his mother had serious kidney problems

and was in the hospital at that time. The officers offered to allow the Appellant to write a note, which they would deliver to her. While the Appellant was writing the note, Officer Kennedy offered to get the Appellant some refreshments, and the Appellant asked for a soft drink. When Officer Kennedy returned with the drink, he told the Appellant that he wanted to use his "one free question" to ask the Appellant what he knew about the victims. Before the Appellant responded, Officer Kennedy asked if the Appellant had any problems talking with the officers "now." The Appellant said, "Nah, man."

The Appellant told the officers that he did not know the victims and that "if you put a picture down, if he saw them, he wouldn't even know who they were." However, during the interview, the Appellant referred to one of the victims "as the bigger one, because you know, Timothy Gill was a big man." He said that after he was incarcerated, he discovered that the victims were involved in his nephews' cases but that his nephews never talked to him about the victims. The Appellant said that his nephews' names were "Anthony" and "Morris." He acknowledged that he knew a female named Viola, that "the biggest one" was her nephew," and that the "Ricky one goes with her sister."

The Appellant said that he had heard the killing was "professional" and that approximately $10,000 to $15,000 was in the room. Officer Kennedy said that it sounded as if someone was "setting up" the Appellant. The Appellant responded that anyone who knew him knew that he was "straight" and that he came "with God's love and respect." He acknowledged, however, that actions had "repercussions" and that if someone touched him physically, he would retaliate physically. He explained that the only time he would feel the need to retaliate was if he or his family were threatened. He acknowledged that as a result of his "philosophy," he had developed "a reputation."

The Appellant explained that initially, he was reluctant to talk with Agent Barham and Officer Kennedy because of the way he had been treated by other officers. He stated that he had no prior relationship with the victims, could not recognize them from a photograph, and had never spoken with either of the victims on the telephone. The Appellant acknowledged that he "did drop some dope off to Viola" sometime in September and that after the victims' deaths, she told him the drugs were for Mr. Elliott. The Appellant said that he did not know Mr. Elliott and that if he had, there was "no way in hell" he would have sold Mr. Elliott drugs because he could not be trusted. The Appellant later said that he "served them about three times" through Viola and that he once asked Viola who the man was that he saw run back from the door. The Appellant said that on the third occasion, he was with a man named Ernie and that Ernie told him the man was Mr. Elliott. The Appellant said at that time, he did not know Mr. Elliott was the person who was "setting people up." The Appellant said that he did not know where the victims lived until "after the fact" but that he knew where Viola and her sister lived.

Near the end of the interview, the Appellant told the officers that he had been willing to talk with them because Officer Kennedy was a Cubs fan and because the officers were willing to take a letter to his mother, which he "respect[ed]." The officers told the Appellant that whoever killed the victims was on "their A game" and that it was "just business." The Appellant stated that if he had been involved, he would not have left any money. When asked his whereabouts on the night of the murders, the Appellant responded that he and his girlfriend were in Cowan and that they were pulled over by the police. Before the end of the interview, Officer Kennedy asked the Appellant if they could "holler back at" him in a couple of weeks, and the Appellant immediately responded, "Yeah." Throughout most of the discussion, the Appellant was animated, laughed, and talked freely without any apparent reluctance.

At the conclusion of the hearing, the trial court stated:

> Regarding the motion to suppress the statement based upon the [Appellant's] allegation or the [Appellant's] argument that he had asserted his Fifth Amendment rights during a questioning or a meeting that took place, I believe, at the Winchester Police Department, the Court believes that the [Appellant], although stating at one point that he didn't wish to talk to the police about this, he continued to make statements and kept giving information, that the giving of information wasn't really prompted by the police department. The Court finds the statements that he gave during that questioning were voluntary, that the State and their agents neither coerced him physically or psychologically. I also find that no threats or promises were rendered to entice the [Appellant] to make those statements and that in no way did the State try to overcome the suspect's or the [Appellant's] will in making those statements. In fact, as the Court recalls, [the Appellant] actually became quite cooperative and kept making statements and kept talking to the police without being really prompted by the police. I think there was a few times when the police officers asked him what he meant by something, but other than that, I believe the discussions that took place between [the Appellant] and [Officer] Kennedy and Agent Barham were nothing but volunatry conversation made at the time.

On appeal, the Appellant again argues that the officers should have ceased questioning after he asserted his Fifth Amendment right to remain silent.[2] The State responds that the trial court correctly found that the Appellant did not invoke his right to remain silent. We agree with the State.

Both the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide protection against compulsory self-incrimination. As our supreme court has explained:

> In <u>Miranda v. Arizona</u>, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 694 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The procedural safeguards must include warnings prior to any custodial questioning that an accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney.

<u>State v. Blackstock</u>, 19 S.W.3d 200, 207 (Tenn. 2000). However, <u>Miranda</u> rights may be waived by an accused. <u>Id.</u> Whether a waiver has been voluntarily, knowingly, and intelligently made must be determined by the totality of the circumstances surrounding the interrogation. <u>State v. Van Tran</u>, 864 S.W.2d 465, 472-73 (Tenn. 1993). A trial judge's findings of fact at a motion to suppress hearing are accorded the weight of a jury verdict. <u>See</u> <u>State v. Tate</u>, 615 S.W.2d 161, 162 (Tenn. Crim. App. 1981). Accordingly, the trial court's decision is binding upon this court if the decision is supported by a preponderance of the evidence. <u>State v. Odom</u>, 928 S.W.2d 18, 22-23 (Tenn. 1996).

We agree with the trial court that the Appellant's right to remain silent was not violated. Our supreme court has cautioned that "if 'at any time prior to or during questioning' the suspect invokes his right to remain silent, 'the interrogation must cease.'" <u>State v. Climer</u>, 400 S.W.3d 537, 557 (Tenn. 2013) (quoting <u>Miranda</u>, 384 U.S. at 473-74). Moreover, "this court has stated that whether a suspect has invoked his right to counsel is an objective, not subjective, standard. We see no reason why the standard for the right to remain silent would be any different." <u>State v. Robert Nelson Buford, III</u>,

---

[2] In both his motion to suppress and his appellate brief, the Appellant claimed that the officers violated his "unambiguous assertion of his Fifth Amendment right to counsel during a custodial interrogation." However, the Appellant never cited to a place in the record where he asserted his right to counsel. Moreover, the substance of his argument, both in the lower court and this court, concerned the Appellant's invocation of his right to remain silent.

No. M2011-00323-CCA-R3-CD, 2013 WL 375424, at *11 (Tenn. Crim. App. at Nashville, Jan. 31, 2013) (citing State v. Koffman, 207 S.W.3d 309, 318 (Tenn. Crim. App. 2006)).

The trial court noted that although the Appellant initially stated that he did not want to talk, he nevertheless continued speaking with the officers. We agree with the trial court that the Appellant did not unequivocally invoke his right to remain silent. See State v. Dotson, 450 S.W.3d 1, 53 (Tenn. 2014).

Moreover, as the trial court found, the officers did not pressure or threaten the Appellant to get him to make a statement. Instead, the Appellant, after being advised of his Miranda rights and saying that he understood those rights, freely spoke with the officers. Further, when the Appellant turned from such topics as sports, family, and food and started to talk about the victims' murders, the officers asked if he had any problem talking to them, and the Appellant responded that he did not. Indeed, during the conversation with the officers, the Appellant remarked that speaking with the officers might benefit him in some way. The trial court held that the Appellant's statement was given freely and voluntarily. We agree and conclude that the trial court did not err by allowing the statement to be admitted at trial.

## B. Rule 404(b)

The Appellant contends that the trial court erred by allowing Ms. Eddings to testify that the Appellant went to a motel room to rob Mr. Elliott.

During trial, the State advised the trial court that it intended to call Kimberly Eddings and Mitzi Elliott to testify that the Appellant was lying in his recorded statement when he said that he did not know the victims. The State argued that the testimony was admissible to show motive. The State said that Ms. Eddings would testify that the Appellant, Ernie May, and she went to the Quality Inn in Tullahoma "sometime" prior to the murders with the intent to rob Mr. Elliott. Mrs. Elliott would testify that the Appellant and Mr. May came to the motel room and asked for Mr. Elliott but that they left because Mr. Elliott was not in the room. Defense counsel objected, arguing that the evidence regarding the "attempt at a robbery that never happened" was not reliable.

The trial court asked the State whether "there ha[s] to be an inference or a question about why they were there, other than they were there for Mr. Elliott and Mr. Gill." The State explained that the testimony would demonstrate "that there was a prior attempt to rob this same individual who was robbed on the night of the murders by the same [Appellant]." The court then asked, "So action in conformity with?" The State responded, "This was a second attempt to make the first crime. I don't believe it is character evidence per se. I think it is really more along the lines of a common scheme or

- 15 -

plan." Defense counsel contended that the testimony was "clearly conformity evidence" and was "too speculative" to be admissible.

During a jury-out hearing, Ms. Eddings testified that a couple of weeks prior to October 30, the Appellant, Ernie May, and she drove to the Executive Inn in Tullahoma. The complex contained a Mexican restaurant and another motel, but she could not recall the name of the other motel. It was dark outside when they arrived. The Appellant and Mr. May "got out of the car with a pair of gloves and a knife to go and rob some guys upstairs because they thought they had money." Ms. Eddings said that she knew the Appellant intended to rob someone because he "said that he was going to go hit a lick," which she explained meant to rob someone. Ms. Eddings did not know the person's name. Ms. Eddings saw the men walk upstairs; however, they quickly returned to the car, which made Ms. Eddings think that their intended target was not there.

After Ms. Eddings's testimony, the trial court stated:

> I think under the procedures laid out in the *Tennessee Rules of Evidence*, I first must find that the evidence is relevant. I think it is relevant for a couple of reasons. One, robbery is a motive for the incident in question on the night in question the murders happened, also relevant in the fact that it has been at least insinuated that [the Appellant] didn't know these guys and didn't know where they were staying at the time, and I think it also corroborates that. Finding it relevant, I then must look at whether or not its probative value is substantially outweighed by the danger of unfair prejudice. If it had to do maybe that he was going over there to possibly harm them, it might be a little bit of a different story, so since this is a criminal case, I also have to look at it under 404(b). In regards to character evidence, that is usually not admissible to prove conduct. However, under character evidence generally, (b) under "Other crimes, wrongs, and acts," I have previously determined, and I am determining again, that a material issue does exist in regards to the [Appellant's] motive for the alleged crime of murder in the case and for the fact that it has been at least insinuated and otherwise stated that he didn't know these gentlemen and/or know where they were living. I find that this evidence is clear and convincing that this did occur, and finally, I find that its probative value is not outweighed by the danger of unfair prejudice. . . .

On appeal, the Appellant does not challenge the relevance of the evidence but contends that the proof of the prior attempt was not clear and convincing and that its probative value did not outweigh its prejudicial effect.

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Such evidence may be admitted for other purposes, though, if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Before allowing such evidence,

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Where, as here, a trial court has substantially complied with the procedural requirements of the rule, we will review the court's decision regarding the admissibility of the evidence for an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

As we noted, the trial court found that Ms. Eddings's testimony was relevant to the Appellant's motive for committing the offenses. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). In Tennessee, evidence of other acts has generally been admitted

> to establish motive in three types of cases. In the first, the evidence suggests that a second crime was committed to conceal or continue a prior crime. In the second type, a prior

> crime may establish an accused's desire to obtain or retain money, property, or a relationship which led to another crime. In the last type, evidence of the other crime may tend to show that the accused had previously opposed or attempted to injure the victim.

State v. John Henry Wallen, No. 03C01-9304-CR-00136, 1995 WL 702611, at *13 (Tenn. Crim. App. at Knoxville, Nov. 30, 1995) (citation and footnotes omitted); see State v. Richard Lee Sheckles, No. 1, 1990 WL 180339, at *4 (Tenn. Crim. App. at Jackson, Nov. 21, 1990); Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[9] (LEXIS publishing, 6th ed. 2011).

In the instant case, the State contended at trial that the Appellant knew Mr. Elliott had money and that he intended to rob and kill the victims to protect and/or avenge his nephew. The State maintained that proof of the earlier attempted robbery demonstrated that the Appellant knew the victims had money. From our review, we conclude that the evidence showed that the Appellant had motive to rob the victim and that he previously attempted to rob the victim. Further, the evidence contradicted the Appellant's statement to Officer Kennedy and Agent Barham that he did not know the victims or where they were staying.

On appeal, the Appellant argues that Ms. Eddings's testimony was "too speculative" to constitute clear and convincing evidence of the first attempt. In support of his argument, the Appellant cites Ms. Eddings's testimony that she did not know the victims' names, did not know the specific date on which the incident occurred, and did not see what the Appellant did. The Appellant also contends that the phrase to "hit a lick" meant to "make some money." However, Ms. Eddings said that to "hit a lick" meant to rob someone and that she was certain the Appellant and Mr. May went to the motel room with gloves and knife to rob the victims. Moreover, Mrs. Elliott testified that the Appellant and another man came to Mr. Elliott's motel room one night around the same time alleged by Ms. Eddings. The trial court was in the unique position to observe the witness' demeanor and conduct and make a determination about her credibility. See State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). We conclude that the trial court did not abuse its discretion by concluding that the proof of the first attempt was established by clear and convincing evidence.

The Appellant further complains that the trial court erred by finding that the probative value of the evidence outweighed the danger of unfair prejudice, noting that Appellant was facing charges of especially aggravated robbery and that the evidence concerned a robbery. It is within the trial court's discretion to assess the probative value and danger of unfair prejudice regarding the evidence. State v. Burlison, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993). In the instant case, the identity of the perpetrator

and his motive were highly contested issues at trial. Ms. Eddings's testimony revealed that the Appellant planned to rob the victims approximately two weeks before the murders in a scenario similar to the one in which the victims were killed. The evidence showed that the Appellant knew the victims had money, thereby establishing a motive. Therefore, we conclude that the trial court did not abuse its discretion by finding that the probative value of the other act outweighed the danger of unfair prejudice.

Further, we note that the trial court instructed the jury during the testimony and during the final charge that it could not consider the previous attempt to rob the victims as evidence of the Appellant's propensity to commit the crimes for which he was on trial. Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Thus, we conclude that the Appellant is not entitled to relief on this issue.

### C. Jury Instructions

The Appellant contends that the trial court erred in its instruction to the jury on circumstantial evidence and that the instruction violated his constitutional protection against ex post facto laws. The Appellant notes that in 2010, when the crimes were committed, the pattern jury instruction comported with the standard for evaluating the sufficiency of circumstantial evidence set forth in State v. Crawford, 470 S.W.2d 610 (Tenn. 1971). Crawford provided that in order to sustain a conviction based soley on circumstantial evidence, the facts and circumstances of the offense "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." Id. at 612.

In 2011, our supreme court rejected the Crawford standard, holding that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of the evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). As a result of Dorantes, the pattern jury instruction on circumstantial evidence was changed. The Appellant contends that because the offenses occurred in 2010, the trial court should have used the Crawford standard. He asserts that instructing the jury regarding the Dorantes standard violated constitutional ex post facto provisions by "lower[ing] the standard the prosecution must prove in order to convict a defendant." In response, the State contends that "the ex post facto provisions of our federal and state constitutions do not apply to judicial decisions such as Dorantes."

This court has previously examined this exact issue and stated "that the Ex Post Facto Clause does not by its own terms apply to judicial decisions." State v. George Geovonni Thomas, No. E2013-01738-CCA-R3-CD, 2015 WL 513583, at *32 (Tenn. Crim. App. at Knoxville, Feb. 5, 2015), perm. to appeal denied, (Tenn., Aug. 12, 2015). Further, "[t]o the extent that due process protects interests similar to those protected by

- 19 -

the Ex Post Facto Clauses of the state and federal constitutions, retroactive application of an alteration of a common law doctrine of criminal law violates due process only where the alteration is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" Id. (quoting Rogers v. Tennessee, 532 U.S. 451, 461 (2001)).  This court concluded that using the Dorantes standard did not violate the constitutional ex post facto provisions, noting that

> both the Tennessee Supreme Court and [the Court of Criminal Appeals] began utilizing the same standard for direct and circumstantial evidence shortly after the issuance of Dorantes to cases in which the crimes had occurred before January 2011.  See State v. Sisk, 343 S.W.3d 60, 62 (Tenn. 2011) (crimes committed in 2006); State v. Parker, 350 S.W.3d 883, 888, 903 (Tenn. 2011) (crimes committed in 2003); State v. Martinez, 372 S.W.3d 598, 601, 604-05 (Tenn. Crim. App. 2011) (crimes committed in 2008).

Id.  The Appellant is not entitled to relief on this issue.

### D.  Sufficiency of the Evidence

Finally, the Appellant challenges the sufficiency of the evidence sustaining his convictions.  On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.  See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).  In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts.  See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).  Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether

the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

In order to obtain the Appellant's conviction for first degree premeditated murder, the State was required to prove, beyond a reasonable doubt, that the Appellant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a)(1) and (2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103. Serious bodily injury is defined as a bodily injury that involves a substantial risk of death. Tenn. Code Ann. § 39-11-106(a)(34)(A).

The Appellant's challenge to the sufficiency of the evidence of his convictions largely concerns the credibility of the State's witnesses. Specifically, the Appellant contends that in Timica Jones's initial statement, she told the police that the Appellant did not have a gun on the night in question; however, she testified at trial that he did have a gun. The Appellant also contends that Mr. Tarrant testified that the Appellant was driving a silver van when he met with Mr. Hill at Mr. Gray's residence prior to the shooting but that the proof at trial revealed that the Appellant rented a maroon van after the shooting. However, determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that

"the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000).

In the light most favorable to the State, the proof adduced at trial revealed that as a result of the victims' work as confidential informants, the Appellant's nephew was indicted for a felony drug offense. On October 29, the Appellant was at Mr. Gray's house with his nephew and Mr. Tarrant, who were concerned about going to prison. The Appellant told them, "'Don't worry about it. Everything is going to be all right.'" Mr. Hill said that "he had money for – if something would happen to" Mr. Elliott. The Appellant said, "'I got you.'"

That same evening, Mr. Elliott persuaded Ms. Stephens to help him obtain crack cocaine from the Appellant. The Appellant went to Ms. Stephens's house, sold Mr. Elliott the crack cocaine, then left. The victims and Ms. Stephens used some of the crack cocaine before the victims left. A couple of hours later, the victims went to Mr. Elliott, Jr.'s house. While there, the victims drank beer, and Mr. Elliott showed his son $2,100 in cash. Before Mr. Elliott left, he called and gave someone directions to his location in Tullahoma, presumably the first of twenty-two calls he had that evening with the Appellant. The victims left Mr. Elliott, Jr.'s house and returned to the Quality Inn shortly before midnight.

Ms. Jones identified Mr. Elliott as the man who bought the drugs from the Appellant on a back road on the evening of October 29. Later that night, she and the Appellant went to the Quality Inn. The Appellant went into a motel room with a gun. While the Appellant was gone, Ms. Jones heard two "pops." When the Appellant returned to the car, he was carrying an item that appeared to be a cellular telephone. During the drive that night, the Appellant threw away the telephone at one location and threw away the gun at a different location. Cellular telephone records confirmed the route that the Appellant and Ms. Jones traveled that night. Additionally, cellular telephone records confirmed that the Appellant and Mr. Elliott spoke several times that night. Mr. Elliott's last telephone conversation with the Appellant was at 12:27 a.m. on October 30.

While in jail, the Appellant confessed to Mr. Whitaker and Mr. Pentecost that he was involved in the murder of two white men in a motel. Further, in response to questions asked by Officer Kennedy, Agent Poff, and Chief Young, he nodded his head, acknowledging his involvement in the murders.

Regarding the conviction of especially aggravated robbery, the Appellant argues that the State failed to prove that anything was taken from the victims, that a deadly

weapon was involved, or that the victims suffered serious bodily injury. The testimony at trial revealed that two weeks earlier, the Appellant went to Mr. Elliott's motel room to "hit a lick," which meant to rob Mr. Elliott. Ms. Jones testified that on the night of the crimes, the Appellant went into the victims' motel room with a gun and shortly thereafter, she heard two "pops." The victims died from gunshot wounds to the head. Ms. Stephens and Mr. Elliott, Jr., saw Mr. Elliott with a considerable amount of money earlier in the evening; however, when Mr. Elliott's body was found, he had no money. Ms. Jones saw the Appellant leave the motel room with an object in his hand that she thought was a cellular telephone. The Appellant later disposed of the telephone while they drove toward Chattanooga. The police never found Mr. Elliott's cellular telephone. We conclude that the evidence was sufficient to sustain the Appellant's convictions.

### III.  Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE