IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 21, 2019

**STATE OF TENNESSEE v. KELLEY HUFFORD**

**Appeal from the Circuit Court for Montgomery County**
**No. 41301219          Mark J. Fishburn, Judge**

_____

**No. M2018-01823-CCA-R3-CD**

_____

A jury convicted the Defendant, Kelley Hufford, of conspiracy to commit first degree murder, first degree premeditated murder, first degree felony murder, two counts of especially aggravated kidnapping, three counts of aggravated kidnapping, and tampering with evidence for the abduction and homicide of her boyfriend.  On appeal, the Defendant raises only a challenge to the territorial jurisdiction of the court, alleging that the evidence did not establish that the crimes occurred in Tennessee.  After a thorough review of the record, we conclude that the evidence established that the trial court had territorial jurisdiction, and we affirm the convictions, remanding for merger of the kidnapping offenses.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed;**
**Case Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Travis R. Meeks (on appeal and at trial), and Kenneth Merriweather (at trial), Clarksville, Tennessee, for the appellant, Kelley Hufford.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Helen Young and Robert Nash, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The body of the victim, burnt, beaten, and harboring a shotgun wound, was discovered on the morning of May 18, 2013, in a wooded area of Clarksville. The victim was eventually identified as the Defendant's boyfriend, Mr. Jimmy Boyer. An investigation implicated the Defendant and co-defendants Mr. Fredrick "Frank" Persinger, who was the Defendant's new love interest, and Mr. Coray "Ray" Knight, who called the Defendant "Mom[]s." The Defendant and co-defendants were indicted for conspiracy to commit first degree murder, first degree premeditated murder, first degree felony murder committed during the perpetration of kidnapping, especially aggravated kidnapping accomplished by use or display of a deadly weapon, especially aggravated kidnapping by serious bodily injury, aggravated kidnapping with the intent to facilitate the commission of first degree murder, aggravated kidnapping with the intent to inflict serious bodily injury or to terrorize the victim, aggravated kidnapping committed while in possession of a deadly weapon, abuse of a corpse, and tampering with evidence. The trials of the Defendant and co-defendants were severed, and the Defendant was acquitted of abuse of a corpse but convicted of all other charges. On appeal, the Defendant asserts that the State failed to prove territorial jurisdiction. We give a brief summary of the facts at trial.

Sometime around 6:00 a.m. on May 18, 2013, Mr. Christopher Bonine was driving near the intersection of East Fork and West Fork roads in Montgomery County, Tennessee, and saw the victim's burnt body down a dead-end gravel road near a pumping station. The victim was clad only in pajama pants, with no shoes, shirt, or identification. However, the victim was wearing a unique ring, and a photograph of the ring was released in an effort to identify the victim. One of the victim's friends, thinking he recognized the ring and failing to reach the victim, contacted the Defendant, who assured him that the victim had gone to Montana.

At the time of the murder, the victim suffered from addiction to alcohol and drugs and was financially dependent on the Defendant, with whom he lived in Oak Grove, Kentucky. He was estranged from his own family and was not in regular contact with friends. The victim was acquainted, and had for many years been on friendly terms, with co-defendant Mr. Persinger, a recent widower. The victim knew Mr. Knight through the Defendant, and their relationship was complicated by a competition for the Defendant's affections and financial help. The Defendant was a second-grade teacher and had a steady income, which she used to assist the victim, her daughters, and Mr. Knight.

The victim had recently been released from jail and was living at the Defendant's home with the Defendant and her daughter, Ms. Laurie Hufford, with whom the victim had a close, parental relationship. However, the Defendant resented the victim for not contributing to the household, and the victim was regularly sleeping on the couch. The Defendant had previously evicted the victim from her home due to his addiction but had always permitted him to come back. Prior to the crime, she had consulted her attorney about an eviction, and he had advised her that the victim had a warrant for his arrest and that she could have him arrested and evict him while he was in jail.

The State introduced proof in the form of numerous text messages and records of telephone conversations that the Defendant attempted to anger Mr. Persinger, who was in love with the Defendant, and Mr. Knight, who was the son of the Defendant's ex-boyfriend, against the victim. The proof tended to show that Mr. Knight carried out the actual kidnapping and murder of the victim and that the Defendant went to a bar during the time of the murder in order to establish an alibi. The Defendant testified and attempted to show that she had only asked the co-defendants for assistance in evicting the victim, that Mr. Knight "snapped," and that Mr. Knight, along with an unidentified assistant, ultimately murdered the victim independently. She stated that her fear of Mr. Knight prevented her from reporting the crime.

While several of the victim's fingers were missing due to the fire, law enforcement were able to recover fingerprints from the victim's remaining fingers, and after identifying the body, they went to the victim's address and interviewed the Defendant and her daughter. The Defendant told Detective Eric Ewing that she had gone to bed at 9:30 p.m. on Friday, May 17, 2013. She stated that Mr. Knight called her while she was asleep and that she went to meet Mr. Knight at a bar around 12:45 or 1:00 a.m. on May 18th. Due to a mix-up, she went to the wrong bar and did not see him. The victim was asleep on the couch when she left. The Defendant stated that she arrived home around 3:00 a.m. and that she lost her cell phone while at the bar. She discovered the victim's absence in the morning, but finding that his boots, wallet, and telephone were likewise gone, she thought he was either on a drinking binge or had gone to Montana, as he had been planning to do.

When Detective Ewing reviewed the surveillance footage from the bar where the Defendant had gone, he discovered that she was there for a shorter amount of time than she had stated, from approximately 1:33 to 2:10 a.m., and that she was talking on her cell phone as she left. Suspicions raised, Detective Ewing subpoenaed telephone records and was ultimately able to recover the content of text messages among the three co-defendants.

Among the recovered messages were messages sent by the Defendant and apparently intended to anger Mr. Persinger and Mr. Knight against the victim. The Defendant told Mr. Persinger that the victim had taken Mr. Persinger's deceased wife's rings and pills. These pills and rings were ultimately recovered from the Defendant's bedroom. She sent multiple text messages relaying threats that the victim had allegedly made, including that she had overheard him talking on the telephone and threatening to vandalize her home or Mr. Knight's trailer. The victim's telephone records indicated he had not made or received a call during the relevant time. Mr. Persinger responded by text, "He is pushing me to a place i don't want to go but for you i will." On May 17, 2013, the Defendant provided Mr. Persinger with Mr. Knight's contact information, and Mr. Persinger subsequently sent the Defendant a text message stating that Mr. Knight wished to speak to her and that "he said [the victim] goes today."

The Defendant, Mr. Persinger, and Mr. Knight arranged to meet in a liquor store parking lot after the Defendant finished teaching school on May 17th. The Defendant only stayed a short amount of time, but the co-defendants remained. At 4:27 p.m., the Defendant sent Mr. Persinger a message reading, "[I] love you. hope you two boys have it all worked out," to which Mr. Persinger responded, "Close." Mr. Knight sent the Defendant a message at 6:59 p.m. reading, "U better call me if u feel hands need 2 laid. b4 the smile on." At 10:31 p.m., Mr. Persinger sent the Defendant a text message reading, "It may be set." At 12:21 a.m. on May 18th, Mr. Knight called the Defendant, and they spoke for five minutes. The Defendant then sent Mr. Persinger a text message that read, "Ray just called and wants to come now, told him no truck available." The Defendant spoke to Mr. Knight shortly after 12:30 a.m., and at 12:40 a.m., she called Mr. Persinger. She talked to Mr. Persinger again at 1:39 a.m. for two minutes, 2:01 a.m. for ten minutes, and at 2:12 a.m. for two minutes. The three exchanged multiple calls between 7:00 and 9:00 a.m. later that morning, using the Defendant's home telephone number.

Mr. Persinger testified for the State regarding the planning and execution of the crime. He stated that at the meeting outside the liquor store, the Defendant told Mr. Knight that the victim had threatened to burn Mr. Knight's trailer, where he lived with his young child. Mr. Persinger testified that Mr. Knight asked the Defendant, "[Y]ou want me to beat him up and run off or kill him[?]" According to Mr. Persinger, "she said to kill him." After the crime, the Defendant brought Mr. Persinger the victim's boots, and Mr. Persinger disposed of the victim's boots, the victim's wallet, the Defendant's telephone, the victim's telephone, and Mr. Knight's boots in his fire pit. The State introduced partially burnt cell phones and a rubber sole recovered from the remains of a fire at Mr. Persinger's Clarksville residence. Mr. Persinger testified that he saw the Defendant pour bleach on the end of her driveway. The defense introduced records showing that Mr. Persinger suffered from Parkinson's disease, had been diagnosed with

dementia and schizophrenia, and had suffered hallucinations. Mr. Persinger was unable answer questions regarding his age. He acknowledged having made numerous prior statements that the plan was not to kill the victim but only beat him, that the Defendant had not intended murder, and that the Defendant only wanted to evict the victim.

On May 28th, the Defendant participated in an interview which lasted several hours and which was recorded by police. She initially reiterated that she was at a bar and had no knowledge of the victim's disappearance. Confronted with the text messages, she ultimately told Detective Ewing that she had unlocked the door to her home so that Mr. Knight could enter. She heard the victim call to her for help and then heard a stomping noise. She came from her room and saw the victim alive but unconscious on the floor. The assailants were Mr. Knight and a white man, and the Defendant stated she told them to stop. They carried the victim, who was alive, from her home, and she cleaned the carpet and went to the bar. She used a carpet cleaner to clean the carpet more thoroughly the following day. At one point in the interview, she said, "I don't think it was all my idea to kill him."

The Defendant testified at trial generally consistently with her recorded statement. She stated she told the co-defendants that she wanted the victim "gone" "out of [her] house." She never stated she wanted him dead and did not ask them to kill him. She testified that all of the text messages referred to the co-defendants' attempting to persuade or intimidate the victim into leaving. In her testimony, she denied unlocking the door. She stated that Mr. Knight appeared enraged and that she was afraid to intervene in the crime. He instructed her to go to the bar and to keep quiet about the crime, and she did. She explained that she dropped her telephone at the bar's parking lot and accidentally ran over it. She met Mr. Persinger after leaving the bar at 2:10 a.m. and prior to arriving home at 3:00 a.m., and he insisted on taking her telephone to destroy it. Mr. Persinger brought the carpet cleaner the next day and took the victim's boots and wallet. The Defendant introduced proof tending to suggest that another person, described as a "white boy," may have been involved in the crime.

Dr. Bridget Eutenier performed the autopsy and concluded that the victim died from multimodality trauma inflicted during a homicide. The victim had suffered multiple and severe blunt force injuries to his head and neck, including a fracture of a vertebra and subdural and subarachnoid hemorrhages. He was alive when he received the injuries to his head. The victim also suffered a shotgun wound which entered his right buttock. Dr. Eutenier recovered the pellet cup and multiple pellets from the wound. She explained that when a shotgun is fired, the pellets contained with the cup "go from being a solid mass" to "starting to spread out" as the cup unfolds. She stated that the longer distance the shot travels, the further the pellets spread, striking the skin as "satellite pellet wounds." She testified that the shot recovered from the victim was fired from an

indeterminate range and that the shotgun wound had scalloping but no satellite pellets, which indicated that the pellets had begun to separate but had not yet come apart. A number of individual pellets were recovered from the victim's body. Hemorrhaging within the tissue under the skin indicated that the victim had been alive when he was shot. The victim was also severely burnt, so that several of his fingers were missing and his femurs were broken. A test of his blood indicated he had not inhaled smoke, and Dr. Eutenier concluded he was not alive when he was set on fire. The tops of both the victim's feet showed multiple scrapes and bruises, including imbedded gravel, and the bleeding and bruising indicated that he was alive when he received these injuries. Dr. Eutenier acknowledged that she had testified that the thermal injuries were part of the multimodality cause of death but that the victim was already deceased when his body was set on fire.

Numerous pieces of evidence connected Mr. Knight to the killing. A shotgun found between his mattress and box spring and bearing his DNA was determined to have fired the shot found in the victim. The victim's blood was discovered on the front passenger's side of the vehicle Mr. Knight was driving and on a car floor mat recovered from his porch. Blood which was consistent with the victim's blood was found in the rear driver's side of Mr. Knight's vehicle. Testing of soil samples and fabric revealed that gasoline was used to burn the victim, and a red gas can found at Mr. Knight's home bore the victim's blood. Mr. Knight was interviewed by police and ultimately stated that after he heard about the victim's threat to burn his trailer, where his young child lived with him, he "snapped." There was also evidence that Mr. Knight had attempted to have someone kill the Defendant after the co-conspirators were charged with the offenses. A search of the Defendant's home revealed the victim's blood in the carpet in an area behind the couch.

In canvassing the neighborhood in which the victim's body was found, law enforcement spoke to Ms. Courtney Glasl, who lived less than an eighth of a mile from the pumping station near the gravel road. Ms. Glasl went to bed between 10:00 and 11:00 p.m. on May 17th. She woke to a single gunshot at 2:30 a.m. Ms. Glasl testified that she kept a telephone by her bed and checked the time when she heard the shot. She acknowledged that she heard gunshots in the area "[o]ccasionally" and that she did not give a formal statement until a month after the homicide, but she stated she first spoke to law enforcement close in time to the discovery of the body and told them during the initial interview that she had heard a shot.

Mr. James Kendrick, who also lived close to the pumping station, testified that he fairly frequently heard gunshots in the area, in part due to a nearby firing range. He heard a single gunshot at 9:30 or 10:00 p.m. on May 17th. At 2:30 to 3:00 a.m. on May 18th, Mr. Kendrick was awakened by his wife's suffering an asthma attack. He could

smell smoke coming in the bedroom window and went outside to investigate but did not discover the source of the smoke.

Detective Ewing acknowledged that four people near the location of the victim's body reported hearing gunshots on the night of May 17th or morning of May 18th. He stated that Ms. Glasl pinpointed the time by looking at a clock. Another witness guessed the time of the gunshot was close to 1:00 a.m. on May 18th, while some heard a shot around 9:30 p.m. on May 17th. He testified that law enforcement canvassed the Defendant's neighborhood but discovered no information; in particular, no one heard a gunshot. The Defendant's daughter, who was working two different jobs, came home from work at approximately 10:40 p.m. on May 17, 2013, and she saw someone asleep on the couch. She did not hear anything that night over the air conditioning unit in her room, including any gunshots, and she did not see if the victim was on the sofa when she left for her other job at 5:30 a.m. on May 18th. Officer Darren Koski testified that no shotgun pellets were recovered from under the victim's body.

The jury, charged with criminal responsibility, acquitted the Defendant on the charge of abuse of a corpse but convicted her on the remaining counts. The Defendant received a sentence of twenty-two years for conspiracy to commit first degree murder, life in prison for each count of first degree murder, twenty years for especially aggravated kidnapping accomplished with a deadly weapon, twenty-two years for especially aggravated kidnapping by serious bodily injury, twelve years for aggravated kidnapping with the intent to facilitate the commission of a felony, twelve years for aggravated kidnapping with the intent to inflict serious bodily injury or terrorize the victim, ten years for aggravated kidnapping while in possession of a deadly weapon, and six years for tampering with evidence. According to the judgment forms, the two counts charging alternative theories of first degree murder were merged,[1] the two counts charging especially aggravated kidnapping were merged, and the three counts charging aggravated kidnapping were merged. The sentences were all to run concurrently for an effective life sentence.

The Defendant's amended motion for a new trial advanced as a ground of relief that the State did not prove by a preponderance of the evidence that the crime occurred in Montgomery County, Tennessee. The trial court denied the motion for a new trial, finding that the proof established that the murder occurred in Montgomery County. The Defendant appeals, asserting that the State failed to prove territorial jurisdiction.

---

[1] The judgment for the felony murder conviction incorrectly indicates that it is a Class A felony and should be corrected on remand. The judgment for premeditated murder was amended to correct this error.

## ANALYSIS

The Defendant argues that the trial court lacked jurisdiction because the proof did not establish that the crimes were committed in the State of Tennessee. We conclude that the proof was sufficient to establish territorial jurisdiction over each offense.

In her motion for a new trial, the Defendant unsuccessfully argued that the State failed to establish "by a preponderance of evidence that the offense of murder occurred in Tennessee," orally characterizing the challenge as one to "venue." Tennessee Rule of Criminal Procedure 18, addressing venue, provides that "offenses shall be prosecuted in the county where the offense was committed." Tenn. R. Crim. P. 18(a). If the elements of an offense are committed in separate counties, the offense may be tried in either county. Tenn. R. Crim. P. 18(b). Rule 18 also provides that, so long as jurisdiction in the state has been established, "[a]n offense committed in part outside Tennessee may be prosecuted in any county in which an element of the offense occurs." Tenn. R. Crim. P. 18(d)(1). "'Proof of venue is necessary to establish the jurisdiction of the court, but it is not an element of any offense.'" *State v. Young*, 196 S.W.3d 85, 101 (Tenn. 2006) (quoting *State v. Hutcherson*, 790 S.W.2d 532, 535 (Tenn. 1990)). Venue is a jury question and must be proven by a preponderance of the evidence. *Id.*; T.C.A. § 39-11-201(e). To establish venue, the jury may "draw reasonable inferences based on the evidence presented." *State v. Trusty*, 326 S.W.3d 582, 597 (Tenn. Crim. App. 2010). Venue is subject to waiver. *Ellis v. Carlton*, 986 S.W.2d 600, 601 (Tenn. Crim. App. 1998). On appeal, the Defendant no longer pursues a challenge to the venue of the county but instead argues that the State of Tennessee did not have territorial jurisdiction to try the crimes.

"It is elementary that before a court may exercise judicial power to hear and determine a criminal prosecution, that court must possess three types of jurisdiction: jurisdiction over the defendant, jurisdiction over the alleged crime, and territorial jurisdiction." *State v. Legg*, 9 S.W.3d 111, 114 (Tenn. 1999). This is because the criminal laws of a state have no power beyond the state's territorial limits. *Id.* Under article I, section 9 of the Tennessee Constitution, the accused has the right to a trial "by an impartial jury of the County in which the crime shall have been committed…." Tennessee Code Annotated section 39-11-103 addresses jurisdiction in those cases in which a crime is committed in multiple states: "When an offense is commenced outside of this state and consummated in this state, the person committing the offense is liable for punishment in this state in the county in which the offense was consummated, unless otherwise provided by statute." T.C.A. § 39-11-103(b)(1). The statute provides that it is not a defense that the accused was not present in this state for the consummation of the offense if the accused used "[a]n innocent or guilty agent" or "[o]ther means proceeding directly from the person." T.C.A. § 39-11-103(b)(2). Likewise, "[w]hen the commission

of an offense commenced within this state is consummated outside of its boundaries, the offender is liable to punishment in this state in the county where the offense was commenced." T.C.A. § 39-11-103(c). When separate elements of an offense are committed in separate counties, "the offense may be prosecuted in either county." T.C.A. § 39-11-103(d).

"Territorial jurisdiction, i.e., that the offenses charged occurred in the State of Tennessee, is a more fundamental concern than venue and recognizes that a 'state's criminal law is of no force and effect beyond its territorial limits.'" *State v. Willard Hampton*, No. W2018-00623-CCA-R3-CD, 2019 WL 1167807, at *6 (Tenn. Crim. App. Mar. 12, 2019) (quoting *Legg*, 9 S.W.3d at 114), *no perm. app. filed*. Like venue, territorial jurisdiction is a factual question for the jury's determination. *State v. Beall*, 729 S.W.2d 270, 271 (Tenn. Crim. App. 1986). However, territorial jurisdiction, unlike venue, must be proven beyond a reasonable doubt. *Willard Hampton*, 2019 WL 1167807, at *6; *State v. Kenneth Fleming*, No. W2016-01017-CCA-R3-CD, 2018 WL 1762208, at *6 (Tenn. Crim. App. Apr. 12, 2018), *no perm. app. filed*; *State v. Charles E. Shifflett, Sr.*, No. E2006-02162-CCA-R3-CD, 2008 WL 1813106, at *12 (Tenn. Crim. App. Apr. 23, 2008); *Beall*, 729 S.W.2d at 271.

In the trial court, the Defendant argued that the State did not "prove by a preponderance of evidence" that the homicide occurred in Montgomery County, Tennessee. The Defendant did not specifically argue that the state's territorial jurisdiction was not established beyond a reasonable doubt, and she offered no challenge to the court's jurisdiction over the conspiracy, kidnapping, or tampering with evidence convictions. On appeal, she argues that the prosecution did not prove territorial jurisdiction over any of the offenses beyond a reasonable doubt. Although the issue was not raised below, an objection to jurisdiction may be heard at any time during the pendency of the proceedings. *State v. Martinos Derring*, No. W2017-02290-CCA-R3-CD, 2019 WL 244471, at *3 (Tenn. Crim. App. Jan. 16, 2019) (citing Tenn. R. Crim. P. 12(b)(2) and concluding that absent explicit waiver, neither an argument regarding venue nor one regarding lack of territorial jurisdiction had been waived), *perm. app. denied* (Tenn. May 17, 2019); *compare State v. Wayne Boykin*, No. W2010-00719-CCA-R3-CD, 2011 WL 4449671, at *7 (Tenn. Crim. App. Sept. 26, 2011) (concluding that when neither venue nor territorial jurisdiction was challenged in the motion for a new trial, venue was waived but territorial jurisdiction was not). The Tennessee Supreme Court, in addressing the propriety of a habeas corpus petition alleging lack of territorial jurisdiction, observed that "if the court of conviction was actually without territorial jurisdiction, then the appellee's conviction is void." *State v. Ritchie*, 20 S.W.3d 624, 631 (Tenn. 2000) (concluding that the petitioner was not entitled to a hearing or relief unless the lack of territorial jurisdiction appeared clearly on the face of the judgment or record of the trial). Likewise, in examining a defendant's request to withdraw a guilty plea

based on a claim of lack of territorial jurisdiction, this court observed that "if the trial court lacks territorial jurisdiction, the true effect of the trial court's lack of jurisdiction would render the charges invalid and hence the pleas moot." *State v. Myrtle B. Lambert*, No. E2008-01670-CCA-R3-CD, 2010 WL 1293735, at *5 (Tenn. Crim. App. Apr. 6, 2010). Accordingly, we address the argument regarding territorial jurisdiction despite the Defendant's failure to include the issue in the motion for a new trial.

The Defendant argues that there was insufficient proof to establish that the homicide was consummated in Tennessee. The consummation of a crime occurs "'when the last element necessary for commission of the crime is satisfied.'" *Charles E. Shifflett, Sr.*, 2008 WL 1813106, at *12 (quoting *Legg*, 9 S.W.3d at 115). The last element of homicide is the victim's death. *Id.* In a trial for homicide, there is a rebuttable presumption that the crime was committed in the location in which the body is found. *Beall*, 729 S.W.2d at 271 (concluding that such a presumption applies equally in questions of venue and territorial jurisdiction); *see Richard Williams v. Tony Mays, Warden*, No. M2018-01980-CCA-R3-HC, 2019 WL 3021164, at *2 (Tenn. Crim. App. July 10, 2019) (citing *Reynolds v. State*, 287 S.W.2d 15, 16 (Tenn. 1956)), *perm. app. filed* (Tenn. Sept. 10, 2019); *State v. Killebrew*, 760 S.W.2d 228, 232 (Tenn. Crim. App. 1988) (the only evidence regarding the location of the murder was the discovery of the body along an interstate with a rope around the neck, and this was sufficient to prove jurisdiction beyond a reasonable doubt); *see also Trusty*, 326 S.W.3d at 599 (concluding that venue was adequately established when the jury made the presumption that the victim died in the county in which the body was found rather than crediting the defendant's testimony). The defendant may present contrary evidence to rebut the presumption, but whether the presumption is rebutted is a question for the jury. *Beall*, 729 S.W.2d at 271 (concluding that, although the defendant presented evidence that the homicide occurred in Kentucky, the jury was entitled to discredit the evidence); *see Trusty*, 326 S.W.3d at 600 ("The jury was, moreover, entitled to disbelieve any implication contained in the defendant's testimony that the victim died in Davidson County.").

Ultimately, "[w]hether … the killing occurred in Kentucky or whether the killing occurred in Tennessee [is] a factual matter to be resolved by the jury after hearing all the testimony of the witnesses, weighing their credibility, and applying to the facts the law as given them by the trial judge." *Beall*, 729 S.W.2d at 271. In *Beall*, the defendant asserted that he had shot his wife at a gas station in Kentucky, giving a description of the alleged location. *Id.* Although there was no location matching the defendant's description in Kentucky, such a location existed in Montgomery County, Tennessee, near the place the victim's body was found. *Id.* This court concluded that the evidence was "sufficient for the jury to [find territorial jurisdiction] beyond a reasonable doubt." *Id.*

- 10 -

The jury was charged with a theory of criminal responsibility for all of the Defendant's offenses. *See* T.C.A. §§ 39-11-401, -402. First degree premeditated murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1). First degree felony murder, as charged here, is the killing of another in the perpetration of or attempt to perpetrate kidnapping. T.C.A. § 39-13-202(a)(2). Here, the proof at trial showed that after conspiring with the Defendant to harm the victim, Mr. Knight arrived at the Defendant's Kentucky home sometime after 12:30 a.m. on May 18th. At the Defendant's home, Mr. Knight assaulted the victim, causing him to bleed, but according to the Defendant's own testimony, the victim was still alive when Mr. Knight forcibly removed the victim from the Defendant's home. Dr. Eutenier testified that the victim was alive when he sustained the blunt force injuries to his head, that he was alive when he sustained the scrapes and bruises and the embedding of gravel in the tops of his feet, and that he was alive when he was shot with a shotgun. The victim's body was discovered down a gravel road near a pumping station in Tennessee. Law enforcement canvassed the Defendant's Kentucky neighborhood and no one, including the Defendant's daughter asleep in her room, heard a gunshot. Witnesses heard gunshots in Montgomery County, Tennessee, near where the victim's body was discovered. While some witnesses heard a shot earlier in the night, Ms. Glasl was awakened by a single gunshot and checked her telephone, which showed that the time of the shot was 2:30 a.m. Near the same location at around 2:30 to 3:00 a.m., Mr. Kendrick was awakened by his wife's suffering an asthma attack due to smoke coming in his window. Dr. Eutenier testified that the victim was not alive when his body was set on fire. While the Defendant claims that the failure of law enforcement to find shotgun pellets at the site where the body was found indicates that the victim was not murdered in Tennessee, Dr. Eutenier testified that there were no satellite wounds around the pellet cup, indicating that the pellets had not yet begun to separate. Likewise, the jury was entrusted with resolving inconsistencies in witness testimony regarding the timing of the shot. *Beall*, 729 S.W.2d at 271. We conclude that the evidence was sufficient for the jury to find beyond a reasonable doubt that the homicide was consummated in Tennessee.[2] *See id.* We note that this court has held that the trial court had jurisdiction to try the co-defendant, Mr. Knight, for the murder of the victim on similar evidence. *State v. Coray Eugene Knight*, No. M2017-01584-CCA-R3-CD, 2018 WL 6720666, at *21 (Tenn. Crim. App. Dec. 20, 2018) (concluding that the trial court did not err in refusing to dismiss the homicide counts based on lack of territorial jurisdiction because "the record establishes the victim died in Montgomery County, Tennessee"), *perm. app. denied* (Tenn. Apr. 11, 2019). We conclude that the proof adequately established jurisdiction to convict the Defendant of first degree premeditated murder and first degree felony murder.

---

[2] The Defendant does not raise any issue regarding jury instructions.

Likewise, the proof established jurisdiction over the tampering with evidence conviction. The Defendant was convicted of destroying a record, document, or thing with the intent to impair its verity, legibility, or availability as evidence in an investigation or proceeding which she knew was in progress. *See* T.C.A. § 39-16-503(a)(1). The conviction for tampering with evidence was based on conduct that occurred at the Clarksville home of Mr. Persinger, where Mr. Persinger testified the evidence was burned at the Defendant's direction and where the remains of cell phones and the remains of shoes were discovered in the fire.

The Defendant's remaining convictions constitute continuing offenses. "[A] continuing crime, although complete in the jurisdiction where first committed, *may continue to be committed, and may also be punished, in another jurisdiction.*" *Legg*, 9 S.W.3d at 115 (quoting 22 C.J.S. *Criminal Law* § 161(b) (1989)). Accordingly, even if the elements of the offense "were first satisfied in another state," a continuing offense may be punished in Tennessee "so long as any essential element to the offense continues to be present in Tennessee." *Id.* at 116. Aggravated kidnapping and especially aggravated kidnapping are continuing offenses. *State v. Jimmy Lee Whitmire*, No. M2007-01389-CCA-R3-CD, 2009 WL 2486178, at *17 (Tenn. Crim. App. Aug. 13, 2009); *State v. Antonio Dewayne Carpenter*, No. W2001-00580-CCA-R3-CD, 2002 WL 1482799, at *7 (Tenn. Crim. App. Feb. 12, 2002); *see Legg*, 9 S.W.3d at 118. When aggravated kidnapping is based on bodily injury, the State need not demonstrate that the bodily injury occurred in the State of Tennessee so long as at least one essential element of the crime was continued in this state. *Legg*, 9 S.W.3d at 118.

The Defendant was convicted of two counts of especially aggravated kidnapping, which, as charged, required the State to show that the Defendant, or a person for whose actions she was criminally responsible, knowingly removed or confined the victim unlawfully so as to interfere substantially with his liberty, and that the false imprisonment was accomplished with the use or display of a deadly weapon in one count, and resulted in the victim's serious bodily injury in the other count. T.C.A. §§ 39-13-302, -305(a)(1), (4). The Defendant was also convicted of three counts of aggravated kidnapping, which required the State to show that the false imprisonment was committed to facilitate the commission of premeditated murder in one count, was committed with the intent to inflict serious bodily injury on or to terrorize the victim in another count, and was committed while the perpetrator was in possession of a deadly weapon in the last count. T.C.A. § 39-13-304(a)(1), (3), (5). Here, the evidence was sufficient to establish that a co-conspirator forcibly removed the victim from his home in Kentucky. The co-conspirator then forcibly took the victim to a gravel road in Montgomery County, Tennessee, where he shot the victim and where the victim ultimately died. Accordingly, an element of the offense took place in Tennessee, and the evidence was sufficient to establish that the trial court had territorial jurisdiction.

The Defendant was convicted of conspiracy to commit first degree premeditated murder, which required the State to show that, acting with the intent to commit first degree premeditated murder and acting for the purpose of promoting or facilitating the crime, she and the co-conspirators entered into an agreement for one or more of them to engage in conduct that constitutes the crime and that one or more of them committed an overt act in furtherance of the conspiracy. *See* T.C.A. § 39-12-103. The Defendant argues that any agreement to kill the victim was entered into at the gas station in Kentucky and that Tennessee accordingly lacks territorial jurisdiction. However, conspiracy is also a continuing offense. *State v. Martinez*, 372 S.W.3d 598, 607 (Tenn. Crim. App. 2011); T.C.A. § 39-12-103(e)(1) ("Conspiracy is a continuing course of conduct…."). The offense "terminates when the objectives of the conspiracy are completed or the agreement that they be completed is abandoned by the person and by those with whom the person conspired." T.C.A. § 39-12-103(e)(1). The objectives of the conspiracy may include "measures, other than silence, for concealing the crime or obstructing justice in relation to it." T.C.A. § 39-12-103(e)(1). This court has upheld jurisdiction where the conspiracy was alleged to have begun in another state but an overt act in furtherance of the conspiracy occurred in Tennessee. *Martinez*, 372 S.W.3d 598, 607. Here, the proof established that overt acts in furtherance of the conspiracy, namely the killing of the victim and burning of the body, occurred in Montgomery County. Accordingly, the trial court had territorial jurisdiction over this crime.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgments of the trial court. We note that, according to the judgment forms, although the trial court merged the especially aggravated kidnapping charges into one another and the aggravated kidnapping charges into one another, the trial court did not merge all of the offenses into a single conviction for especially aggravated kidnapping. *See State v. Joe Michael Turner*, No. E2009-00069-CCA-R3-CD, 2010 WL 3706434, at *4 (Tenn. Crim. App. Sept. 22, 2010) (concluding that a conviction for especially aggravated kidnapping alleging the use of a deadly weapon and three separate convictions for aggravated kidnapping based on facilitation of a felony, bodily injury, and possession of a deadly weapon should have merged when there was one kidnapping). We remand for the trial court to correct the judgment forms to indicate merger of all the kidnapping offenses.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE

- 13 -